**UNITED STATES of America, Plaintiff,**

v.

**Jeffrey Paul GRUBER, et al., Defendants.**

**No. CR94–2022–MJM.**

United States District Court, N.D. Iowa, Eastern Division.

Feb. 3, 1998.

Kandice Wilcox, Asst. U.S. Atty., for U.S.

Wallace L. Taylor, Cedar Rapids, IA, for Defendant Pierce.

Dennis W. Hartley, Colorado Springs, CO, for Defendant Gruber.

## ORDER REGARDING DEFENDANT GRUBER'S MOTIONS TO SUPPRESS

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ..................................1029

II. FINDINGS OF FACT ................................................1030
 A. Facts Relating To Issuance Of Search Warrants ......................1030
 B. Facts Relating To Interception Of Wire Communications ................1031

III. LEGAL ANALYSIS .................................................1035
 A. Search Warrant Challenges .........................................1035
 1. Warrants' specificity ...........................................1035
 a. Specificity requirement in general ...........................1035
 b. Specificity of the search warrants in this case ..................1036
 2. Probable cause for the warrants' issuance ........................1037
 3. First Amendment material .......................................1039
 4. Fruit of the poisonous tree argument ............................1040
 B. Challenges To Interception Of Wire Communications ...................1040
 1. Probable cause for authorizing Title III interception .................1040
 2. Analysis of probable cause ......................................1043
 3. Necessity Requirement .........................................1044
 4. Gruber's facial challenges to interception order and extensions .......1045
 5. Minimization ..................................................1047

6. *Franks issue* ........................................1048

IV. *CONCLUSION* ..........................................1050

Defendant's motions to suppress the fruits of wiretap orders and search warrants raise multiple claims, all of which surround the validity of the search warrants and the wiretap authorizations. The court, therefore, is called upon here to undertake the task of ascertaining whether the search warrants and wiretap authorizations employed in the investigation of this case were lawful.

## I. INTRODUCTION AND BACKGROUND

On September 28, 1995, defendant Jeffrey Paul Gruber, along with thirteen others, was charged in forty count superseding indictment with racketeering, in violation of 18 U.S.C. § 1962(c), conspiracy to commit racketeering activity, in violation of 18 U.S.C. § 1962(d), conspiracy to distribute and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii), distributing and possessing with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3), possessing with intent to sell a motor vehicle part knowing that the vehicle identification number of the part had been removed, obliterated, tampered with and altered, in violation of 18 U.S.C. § 2321, money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the commission of violent crimes in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(3), firearms offenses, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and with engaging in a continuing criminal enterprise, in violation of 21 U.S.C. §§ 848(b) and 848(c).

Defendant Gruber has filed a Combined Motion To Suppress in which he seeks to suppress evidence obtained as a result of the execution of four search warrants. As to each warrant, defendant Gruber moves to suppress evidence on the same two grounds: first, that the search warrants lack sufficient particularity and, second, that once allegedly improper materials are removed from the supporting affidavit, probable cause for issuance of the warrant did not exist. With respect to two warrants issued on February 2, 1994, which authorized the search and seizure of indicia of membership, defendant Gruber challenges the validity of those two warrants on the grounds that the issuing magistrate failed to subject them to heightened scrutiny which Gruber asserts was required in light of their implications to defendant Gruber's First Amendment rights. Defendant Gruber also challenges the validity of two of the search warrants on the ground that the respective warrant applications contained tainted information that was garnered from prior searches which were purportedly illegal. Defendant Gruber contends that absent the tainted materials, probable cause for issuance of the warrants did not exist. The government filed a timely resistance to defendant Gruber's motions.

Defendant Gruber has also filed a Motion To Suppress Intercepted Communications in which he seeks to suppress evidence derived from an interception authorized under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. §§ 2510–2520. Defendant Gruber has moved to suppress evidence discovered as a result of a wiretap on four grounds: first, that probable cause for the interception did not exist; second, that the necessity requirement of Title III, 18 U.S.C. § 2518(3)(c) had not been satisfied; third, that defects exist in the order authorizing interception and the orders granting extensions of the interception; and finally, that error occurred during the monitoring phase of the interception. Defendant Gruber subsequently filed a supplemental memorandum which raised for the first time the issue of whether the affidavit used to obtain the wiretaps in this case contains intentional misstatements, and requested an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The court granted defendant Gruber's request for a *Franks* hearing.

An evidentiary hearing on defendant Gruber's motions was held on January 22, 1998, at which defendant Gruber presented the testimony of Internal Revenue Special Agent Kerry A. Bolt, and Federal Bureau of Inves-

tigation Special Agent Mark Terra. The United States was represented by Assistant United States Attorney Kandice Wilcox. Defendant Gruber was represented by Dennis W. Hartley, Colorado Springs, Colorado.

## II. FINDINGS OF FACT

### A. Facts Relating To Issuance Of Search Warrants

On December 8, 1993, law enforcement officers sought and obtained a search warrant for the residence of Jeffrey Paul Gruber. The search warrant application was supported by Internal Revenue Service Special Agent Kerry A. Bolt's twenty-three page affidavit. Special Agent Bolt related in his affidavit that some of the information contained in it was garnered from law enforcement officers from the Federal Bureau of Investigation, Iowa Division of Narcotics Enforcement, the Black Hawk County Sheriff's Office, the Bremer County Sheriff's Office, the Waterloo Police Department, and the Cedar Falls Police Department. In addition to information gained from other law enforcement officers and agencies, Special Agent Bolt avers in his affidavit that additional information was obtained from confidential informants. Special Agent Bolt related information in his affidavit from five confidential informants who had personal knowledge of defendant Gruber's involvement in an ongoing and organized scheme to distribute methamphetamine in conjunction with the Sons of Silence Motorcycle Club. Some of these confidential informants had observed large quantities of methamphetamine at Gruber's residence. Additionally, some of the confidential informants further provided information that Gruber maintained cash and drugs at this residence. One of the confidential informants identified Gruber as the "money man" of the organization.

The warrant authorized a search of the premises for:

1. Books, records, notes, receipts, ledgers, invoices, contracts, bank statements, deposit slips and cancelled checks, money drafts, letters of credit, money orders and cashier checks, receipts, passbooks, bank checks, lease agreements, loan records, financial statements, diaries, cash receipts and distribution journals, letters of credit, documents and/or keys relating to information, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money. All of the foregoing items should be related to the time period of 1987 to the present date.

2. Papers, tickets, notes, schedules, receipts, passports and other items relating to intrastate, interstate or foreign travel.

3. Addresses and/or telephone books and papers reflecting names, addresses and/or telephone numbers.

4. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and/or distribution of controlled substances.

5. United States currency, precious metals, jewelry and financial instruments including but not limited to stocks and bonds.

6. Indicia of occupancy, residence and/or ownership of the premises described above including but not limited to utility and telephone bills, cancelled envelopes, keys, and lease agreements.

7. Any and all other paraphernalia, instrumentalities, substances, chemicals, controlled substances, or documents which are evidence of the illicit possession, use, dealing, manufacture, or distribution in controlled substances.

On February 2, 1994, law enforcement officers sought and obtained a second search warrant for defendant Gruber's residence. The search warrant application was supported by Federal Bureau of Investigation Special Agent Mark Terra's forty-two page affidavit. Special Agent Terra related in his affidavit that some of the information contained in it was garnered from law enforcement officers from the Federal Bureau of Investigation, Iowa Division of Narcotics Enforcement, the Black Hawk County Sheriff's Office, the Bremer County Sheriff's Office, the Waterloo Police Department, and the Cedar Falls Police Department. In addition to information gained from other law enforcement officers and agencies, Special Agent Terra related in his affidavit that additional information was obtained from confidential informants. Special Agent Terra's

affidavit details defendant Gruber's involvement in an ongoing and organized scheme to distribute methamphetamine in conjunction with the Sons of Silence Motorcycle Club. In addition, the affidavit relates organizational details of the Sons of Silence and its membership.

In issuing the search warrant, the issuing judge, Chief United States Magistrate Judge John A. Jarvey deleted some of the items sought to be seized. The warrant authorized a search of the premises for:

(A) "COLORS"—Jean jacket or leather jacket with sleeves generally removed; SOS club insignia or logo on back—club, chapter name and/or office held generally present.

(B) Any clothing, jewelry, belt buckles, banners, posters, business cards, and "Patches"—any of these items bearing club insignia or SOS logo or SOS Motorcycle Club slogans, such as SFFS, Support Your Local SOS, etc.

(C) Photographs—pictures of persons wearing SOS Motorcycle Club "colors", "patches", or paraphernalia.

(D) Books and Records—(1) By-laws of the SOS Motorcycle Club and/or Motorcycle Club Charter.

Also on February 2, 1994, law enforcement officers sought and obtained a search warrant for a house owned by defendant Gruber in Jesup, Iowa, and occupied by Robert McAllister ("The McAllister residence"). The McAllister residence search warrant application was supported by the same forty-two affidavit of Special Agent Terra. The warrant authorized a search of the McAllister residence for the same items set out above that were the subject of the February 2, 1994, search warrant for Gruber's residence.

The McAllister residence was subsequently searched on February 4, 1994. While executing the search, law enforcement officers observed firearms, suspected controlled substances and other items. Based on their observations, law enforcement officers sought and obtained a second search warrant for the McAllister residence. In addition to Special Agent Terra's affidavit, the search warrant application for the second search warrant was also supported by the affidavit of Feder-

al Bureau of Investigation Special Agent Dennis Muehlstedt. Special Agent Muehlstedt avers in his affidavit that law enforcement officers had received information from a confidential informant that the Sons of Silence had a "stash house" for firearms. He notes that during the search of the premises, law enforcement officers observed numerous firearms while executing the previously issued search warrant for the McAllister residence.

### B. Facts Relating To Interception Of Wire Communications

On October 16, 1993, the United States presented to Chief Judge Michael J. Melloy its application for interception of wire communications pursuant to Title III. The application was supported by the affidavit of Federal Bureau of Investigations Special Agent Mark Terra ("Terra Aff."). Special Agent Terra's affidavit initially sets forth, *inter alia*, his law enforcement background and experience. Terra Aff. at 1–4. He then identifies the three individuals whose wire communications would be intercepted: Gerald Conrad VanBrocklin, aka "Jerry" or "J.V."; Cynthia Maria Laughlin, aka "Cyndi"; Jeffrey Paul Gruber, aka "No Mind." *Id.* at 4. The affidavit indicates that proposed interception would be for telephone number 319–827–3946, subscribed to by Christine Peverill, and located at 1251 175 Street, Lot # 40, Jesup, Iowa. *Id.* at 4–5. The affidavit then provides background information and the criminal history of each of the three individuals. *Id.* at 7–10. Special Agent Terra's affidavit next sets out the background of the investigation. Terra indicates that since 1987 twenty-two individuals, including six confidential sources subsequently referred to in the affidavit, have identified to task force agents that VanBrocklin "has been involved in trafficking drugs, primarily methamphetamine, between 1987 and the present." *Id.* at 10.

Terra then indicates what information has been provided by a confidential informant, identified in the affidavit as "Source One." The affidavit reveals that Source One has provided drug information to the Federal Drug Task Force in Waterloo, Iowa, "on

numerous occasions during the past one and one-half years." *Id.* It is further revealed that Source One's previous information has served as the basis for two state search warrants which resulted in the arrest of one individual and the seizure of drugs, weapons, and cash. The affidavit goes on to indicate that Source One provided information regarding the investigation, personally knew the individuals distributing the methamphetamine, and that this information had been corroborated through "independent investigative techniques." *Id.* at 11. Source One is identified as providing the following information:

A. In January 1992, Gerald VanBrocklin received his "patch" from the SOS Motorcycle Gang. Receipt of this "patch" made VanBrocklin a full-fledged member of the SOS Motorcycle Gang.

B. In April 1992, VanBrocklin was distributing a large quantity of methamphetamine. One of VanBrocklin's distributors was a person by the last name of Danielson.

C. Methamphetamine seized in a state search warrant executed on September 1, 1992, at the residence of Robert Dennis Folkers came from VanBrocklin. Source One indicated that based on conversation [sic] with VanBrocklin and VanBrocklin's associates, VanBrocklin was Folkers' supplier. (Also see paragraph 13).

D. In January 1993, Source One advised that VanBrocklin was still selling methamphetamine and named two of VanBrocklin's distributors.

*Id.* at 11–12.

Terra indicates that on September 1, 1992, the execution of a search warrant for Folkers' residence resulted in the seizure of more than two ounces of methamphetamine along with packaging materials used in the distribution of methamphetamine. VanBrocklin's vehicle was observed at Folkers' residence at least ten times between August 1991 and September 1992 by law enforcement officers conducting surveillance of Folkers' residence. *Id.* at 12. Folkers committed suicide in November 1992 without ever revealing the source of his methamphetamine. *Id.* at 12–13.

Terra's affidavit next indicates what information has been provided by a confidential informant, identified in the affidavit as "Source Two." The affidavit reveals that Source Two has provided drug information to the Federal Drug Task Force in Waterloo, Iowa, "on numerous occasions beginning in 1988." *Id.* at 13. It is further revealed that Source Two personally knew the individuals distributing the methamphetamine, and that this information had been corroborated. *Id.* Source Two is identified as providing the following information:

A. In February 1993, Source Two stated that he/she does, on occasion, have personal contact with VanBrocklin. Source Two stated that VanBrocklin is currently buying cars, fixing them up, and selling them. Source Two stated that VanBrocklin is not employed and is getting his money through selling drugs.

B. Source Two has stated, as recently as September 1993, that VanBrocklin is living with a female by the name of Cynthia Laughlin, somewhere in a cabin. Source Two advised that Laughlin is a heavy user of methamphetamine.

*Id.* at 13–14.

Terra's affidavit next indicates what information has been provided by a confidential informant, identified in the affidavit as "Source Three." The affidavit reveals that Source Three has provided drug information to the Federal Drug Task Force in Waterloo, Iowa, "on numerous occasions during the past five years." *Id.* at 14. It is further revealed that Source Three's previous information has served as the basis for a previous court ordered wire interception. *Id.* The affidavit goes on to indicate that Source Three provided information regarding the investigation, personally knew the individuals distributing the methamphetamine for the past ten years, and that this information had been corroborated through "independent investigation of the Task Force." *Id.* Source Three is identified as providing the following information:

A. Source Four is involved in the distribution of methamphetamine. During

the spring of 1993, the primary source of Source Four's methamphetamine was Gerald VanBrocklin. Source Three stated as recently as mid-October 1993 that VanBrocklin's source for methamphetamine is Jeff Gruber, aka "No Mind," a color-wearing member of the Sons of Silence, Cedar Falls Chapter, and that Gruber controls the organization's methamphetamine distribution in Iowa.

B. During the spring of 1993, on at least one occasion, he/she overheard Van-Brocklin use the telephone at 1251 175th Street, Lot # 40, Jesup, Iowa, number 319–827–3946, to set up a drug transaction.

*Id.* at 15.

Terra's affidavit next pertains to information that has been provided by a confidential informant, identified in the affidavit as "Source Four." The affidavit reveals that Source Four has been cooperating with Task Force Officers for two months and that between April or May 1993 and June 1993 he had purchased several ounce quantities of methamphetamine from VanBrocklin to sell. *Id.* at 16. Source Four indicated that he spoke to VanBrocklin at 319–827–3946 to arrange the purchase of controlled substances. Pen register records have corroborated Source Four's information. Pen register records indicated calls up to June 18, 1993. *Id.* A wire intercept of Source Four's phone was authorized by Chief Judge Melloy on July 9, 1993. During that wire intercept, conversations were intercepted which implicated Source Four in a conspiracy to distribute methamphetamine. On August 2, 1993, Source Four was interviewed recording his involvement in trafficking in methamphetamine and agreed to cooperate with Task Force agents. *Id.* at 16–17. Source Four has furnished the following information:

A. Source Four was introduced to Gerald Conrad VanBrocklin in April or May of 1993. VanBrocklin became Source Four's supplier of methamphetamine after Source Four's original supplier cut him off because of a drug debt. Source Four purchased methamphetamine from VanBrocklin on several occasions before being "cut off" by VanBrocklin due to drug debt owed by Source Four. In about mid-June 1993, Source Four then made a deal with VanBrocklin, where Source Four agreed to sell more methamphetamine for VanBrocklin and pay off the debt. VanBrocklin "shook hands" on this agreement, but VanBrocklin never came through with his part of the deal. Instead, on about June 18, 1993, Source Four believes that VanBrocklin burglarized Source Four's residence, stealing approximately $4,000 worth of items. An Evansdale, Iowa, police report confirms that on June 18, 1993, Source Four reported that his/her residence and garage had been burglarized.

B. While dealing with VanBrocklin to obtain drugs, Source Four contacted VanBrocklin by telephone at 319–827–3946 on several occasions. Pen register information establishes that the last call occurred on June 18, 1993. During each phone conversation, a meeting place and time would be set for delivery of methamphetamine.

*Id.* at 17–18.

Terra further indicates information has been provided by a confidential informant, identified in the affidavit as "Source Five." The affidavit reveals that Source Five provided information to the Federal Drug Task Force in September 1993 that Source Four told Source Five that he was getting his methamphetamine from "the Number 2 man in the Sons of Silence." *Id.* at 18.

Terra's affidavit also details the phone activity between Source Four and VanBrocklin's home phone of 319–827–3946. *Id.* at 19–20. During the week of August 9, 1993, Source Four called VanBrocklin at home and inquired about repayment of a drug debt. This telephone call was monitored and recorded. *Id.* at 20. A subsequent telephone conversation between Source Four and Van-Brocklin during the week of August 30, 1993, was also monitored and recorded. VanBrocklin was reached at his home telephone number of 319–827–3946. During this conversation Source Four attempted to arrange a methamphetamine transaction with Van-Brocklin, but was told by VanBrocklin that

he did not have any methamphetamine at that time, but Source Four could check with "Rabbit" to learn if he had any methamphetamine to sell.[1] *Id.* at 21.

Terra then indicates a confidential informant, identified in the affidavit as "Source Six" has been supplying information to law enforcement officers since mid-September 1993. The affidavit reveals that Source Six personally knew the individuals he has provided information about and has participated in methamphetamine trafficking with these individuals, and that this information had been "corroborated by independent investigation conducted by agents with the Waterloo Area Federal Drug Task Force and other law enforcement agencies." *Id.* at 22. Source Six stated that VanBrocklin deals methamphetamine for Jeff Gruber. Source Six also indicated that Gruber is the "funnel Point" for the Sons of Silence methamphetamine distribution in Iowa. Pen register information indicates contact between Van-Brocklin's home telephone number of 319–827–3946 and the telephone numbers of other Sons of Silence members. *Id.* at 22–23. In particular, VanBrocklin's telephone number had been used to place 96 calls to Gruber, the most recent being on October 13, 1993.

VanBrocklin was arrested on January 10, 1993, in Kenner, Louisiana, on drug and weapons charges. He subsequently pied guilty on July 26, 1993, to the illegal carrying of a weapon. On September 1, 1993, Van-Brocklin and Cynthia Laughlin and Rick E. Schultz were arrested on drug and weapon charges in Tangipahoa Parish, Louisiana. *Id.* at 24.

Terra's affidavit also indicates that one individual who was approached about cooperating in the investigation, Robert Folkers, committed suicide, and that he was possibly encouraged or "goaded" into committing suicide by targets of the investigation after he revealed to them that he had been contacted by law enforcement officers. *Id.* at 25. The confidential sources indicated to law enforcement agents that they would be "fearful for their lives and most certainly would be in a position of jeopardy if their involvement with law enforcement authorities were known to VanBrocklin and/or his associates." *Id.* Ter-

ra also relates that one individual from whom several controlled buys were made by federal law enforcement authorities was offered complete immunity, but refused to cooperate. Instead, this individual chose to receive a lengthy prison sentence because he feared for his safety and the safety of his family. *Id.* Terra further relates that "nearly all individuals approached have refused to cooperate, stating that they could be threatened by 'death' if they cooperated with law enforcement." *Id.*

On October 16, 1993, Chief Judge Melloy granted the application, finding that probable cause existed that VanBrocklin, Cynthia Maria Laughlin and Jeffrey Paul Gruber, and "others yet unknown" had committed or were committing offenses involving controlled substances. Specifically, the initial wiretap authorization indicated that there was probable cause to believe that the targeted subjects had committed or were committing:

> offenses involving the distribution of and possession with intent to distribute controlled substances, to wit: methamphetamine; conspiracy to distribute and possess with intent to distribute methamphetamine; and the unlawful use of a communication facility (telephone) to facilitate these violations of drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1), 846 and 843(b).

Order of Oct. 16, 1993, at 1. Chief Judge Melloy's authorization order incorporated section 2518(5)'s minimization requirement by providing:

> **IT IS FURTHER ORDERED** that monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code. Interception must be suspended immediately when it is determined, through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of conversation already overheard that the

---

1. The affidavit indicates that "Rabbit" is a nick- name of Randy Thome.

conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to ensure that the conversation has not turned to criminal matters.

Order of Oct. 16, 1993, at 6–7.

Interim reports were filed with the court as directed on November 2, 1993, November 5, 1993, and November 15, 1993. An application for extension of the interception· was granted on November 15, 1993. The extension interception listed "Gerald Conrad Van-Brocklin, aka 'Jerry' or 'J.V.'; Cynthia Maria Laughlin, aka 'Cyndi'; Jeffrey Paul Gruber, aka 'No Mind'; David Lester Fairchild, aka 'Hocus'; James Lee Leisinger, aka 'Crazy'; Rollyn Brent Luethje; Scott Leo Laughlin; Christine Marie Peverill, aka 'Casper,' and others yet unknown" as individuals for whom probable cause had been developed. The November 15, 1993, order extending authorization contained the same authorized offenses.[2]

Special Agent Terra did not identify confidential informant number six, who was identified by the government at the hearing as Cory Pendarvis, as a member of the Sons of Silence. Special Agent Terra's failure to identify confidential informant number six as a Sons of Silence member was not done for the purpose of keeping relevant information from Chief Judge Melloy. Special Agent Terra decided to omit the fact that confidential informant number six was a member of the Sons of Silence because he was concerned that Pendarvis's life would be endangered in the event his Title III affidavit was unsealed prior to indictment.

## III. LEGAL ANALYSIS

The court will commence its legal analysis by examining the issues raised in defendant Gruber's Combined Motion To Suppress. Because there is some overlap in the issues raised regarding each of the four search warrants, the court will proceed by addressing each of the individual issues raised in a topical manner. After addressing Gruber's Combined Motion To Suppress, the court will turn to an examination of the issues raised in Gruber's Motion To Suppress Intercepted Communications.

### A. Search Warrant Challenges

### 1. Warrants' specificity

Defendant Gruber challenges the facial validity of each of the four warrants. Defendant Gruber contends that each warrant's language is so lacking in specificity that it must be deemed an impermissible general warrant and all items seized under it suppressed.

### a. Specificity requirement in general

The Fourth Amendment prohibits the use of general or open-ended warrants. *Dalia v. United States,* 441 U.S. 238, 255, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979); *Rickert v. Sweeney,* 813 F.2d 907, 909 (8th Cir.1987). It requires that a search warrant particularly describe both the place to be searched and the things to be seized. U.S. CONSTITUTION amend. IV; *see United States v. Dockter,* 58 F.3d 1284, 1288 (8th Cir.1995) ("The Fourth Amendment requires that a search warrant describe with particularity the items to be seized and prohibits general, exploratory

---

**2.** Chief Judge Melloy's extension order contained the following minimization language:

 **IT IS FURTHER ORDERED** that monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119. Title 18, United States Code. Interception must be suspended immediately when it is determined [sic] during the portion of conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to ensure that the conversation has not turned to criminal matters. Order of Nov. 15, 1993, at 6. It is clear that language was inadvertently omitted from the sec-

ond line of this paragraph. Obviously, the second line of this paragraph was intended to be identical to that found in the original authorization order:

 Interception must be suspended immediately when it is determined, through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of conversation already overheard that the conversation is criminal in nature.

Order of Oct. 16, 1993, at 7.

searches."), *cert. denied sub nom. Shulze v. United States,* 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996); *United States v. Bieri,* 21 F.3d 811, 815 (8th Cir.) ("The Fourth Amendment requires that a search warrant describe with particularity the items to be seized."), *cert. denied,* 513 U.S. 878, 115 S.Ct. 208, 130 L.Ed.2d 138 (1994); *see also* FED.R.CRIM.P. 41(c)(1) (providing that magistrate "shall issue a warrant identifying the property or person to be seized and naming or describing the person or place to be searched").

The Eighth Circuit Court of Appeals has instructed that a search warrant "must describe the items to be seized with sufficient particularity: 'the language must be sufficiently definite to enable the searcher to reasonably ascertain and identify the things authorized to be seized.' " *United States v. Lowe,* 50 F.3d 604, 607 (8th Cir.) (quoting *United States v. Saunders,* 957 F.2d 1488, 1491 (8th Cir.), *cert. denied,* 506 U.S. 889, 113 S.Ct. 256, 121 L.Ed.2d 187 (1992)), *cert. denied,* 516 U.S. 900, 116 S.Ct. 260, 133 L.Ed.2d 183 (1995); *United States v. Mosby,* 101 F.3d 1278, 1281 (8th Cir.1996) (quoting *Lowe,* 50 F.3d at 607), *cert. denied sub nom. Muhaymin v. United States,* — U.S. —, 117 S.Ct. 2415, 138 L.Ed.2d 180 (1997). This mandate circumscribes the scope of a search and seizure as well as safeguards an individual's privacy interest against a "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *accord Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *see Mosby,* 101 F.3d at 1281 (" 'The purpose of the particularity requirement is to prevent a general exploratory rummaging through a person's belongings.' ") (quoting *United States v. Hibbard,* 963 F.2d 1100, 1102 (8th Cir.1992)). Nothing is meant to be left to the discretion of police officers executing the warrant. *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) (citing *Marron,* 275 U.S. at 196). As a result, courts have demanded that the executing officers be able to identify the things to be seized with reasonable certainty and that the warrant description must be as particular as circumstances permit. *United States v. Bentley,* 825 F.2d 1104, 1110 (7th Cir.1987).

The Eighth Circuit Court of Appeals, however, has instructed that "[w]hether a warrant satisfies the particularity requirement is examined under a 'standard of "practical accuracy" ' rather than a 'hyper-technical one.' " *Mosby,* 101 F.3d at 1281 (quoting *United States v. Peters,* 92 F.3d 768, 769–70 (8th Cir.1996)); *Lowe,* 50 F.3d at 607; *United States v. Strand,* 761 F.2d 449, 453 (8th Cir.1985). A search warrant may contain a catchall phrase as long as it sufficiently limits the discretion of the officers in executing the warrant. *See Andresen v. Maryland,* 427 U.S. 463, 479–82, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). For example, courts have held that a warrant authorizing seizure of "any other papers indicating proof of residency" in connection with a search for other named contraband was sufficiently particular because such proof could be both easily recognized and quickly found. *United States v. Reed,* 726 F.2d 339, 342 (7th Cir.1984).

### b. Specificity of the search warrants in this case

Defendant Gruber has utterly failed to identify in either his motion or in his moving papers which particular aspects of each warrant he finds to be violative of the Fourth Amendment's particularity requirement. The court deems it somewhat ironic that while defendant Gruber asserts that each warrant lacks the requisite particularity, he has himself failed to apprise the court with any specificity regarding his claims. When each search warrant is viewed in its entirety, *see Andresen,* 427 U.S. at 480–81, the court concludes that the warrants did not bestow unbridled discretion upon the executing officers to conduct an "exploratory rummaging" of either Gruber's residence or the McAllister residence. *See Coolidge,* 403 U.S. at 467. Rather, each warrant provided the executing law enforcement officers with considerable guidance, directing them what to search for and seize. Indeed, regarding the second warrant for the McAllister residence, it is difficult to imagine a more precise warrant. The second search warrant for the McAllister residence authorized a search of those premises for four discrete items: two grams of white powdery substance located on a mirror in a desk drawer; firearms; ammuni-

tion; and a motorcycle transmission in the basement. Because each warrant was sufficiently particularized and descriptive of the items to be seized, the court finds that none of the challenged warrants constituted an impermissibly general warrant. Therefore, this aspect of defendant Gruber's Combined Motion To Suppress is denied.

### 2. *Probable cause for the warrants' issuance*

Defendant Gruber also asserts that all four search warrants are invalid because probable cause for the issuance of the four search warrants in this case was lacking. Because the evidence defendant Gruber seeks to have suppressed was garnered through the execution of search warrants, the court must determine whether probable cause existed for issuance of the warrants through employment of the standard announced by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). It is axiomatic that a search warrant affidavit must contain sufficient facts and circumstances in support of the existence of probable cause to allow the issuing magistrate to make an independent evaluation of the search warrant application. The duty of the issuing magistrate is to make a "practical, commonsense decision" as to whether, based on a totality of the circumstances, a reasonable person would have reason to believe that evidence would be discovered. The Eighth Circuit Court of Appeals has instructed that:

> The duty of the judge issuing a search warrant is to make a "practical, commonsense decision" whether, considering all the circumstances, a reasonable person would have reason to suspect that evidence would be discovered. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Probable cause is a fair probability that contraband or evidence of a crime will be found in the location to be searched. *See United States v. Robertson*, 39 F.3d 891, 892 (8th Cir. 1994), *cert. denied*, 514 U.S. 1090, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995).

*United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir.1996). Moreover, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ...

conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 236, 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)); *accord LaMorie*, 100 F.3d at 552; *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir.1995).

Here, reading the supporting affidavits for each warrant in its entirety, the court concludes that each clearly contained information which provided a substantial basis for finding a "fair probability" that contraband or evidence of illegal activity could be found at either defendant Gruber's residence, or the McAllister residence. The supporting affidavit of Special Agent Bolt indicates that a confidential informant. "Source One", provided information regarding defendant Gruber's involvement in an ongoing and organized scheme to distribute methamphetamine in conjunction with the Sons of Silence Motorcycle Club. Source One related that Gruber discussed bringing methamphetamine back with him from a trip to Kentucky over the weekend of September 14, 1992. A second confidential informant, "Source Two," indicated that Gruber was having Ricky Schultz deliver methamphetamine for the Sons of Silence Motorcycle Club. Schultz was, at that time, a prospective member of the Sons of Silence and was working at the direction of Gruber in an attempt to gain membership in that organization. A third confidential informant, "Source Three," informed law enforcement officers that Gruber admitted to having had five pounds of methamphetamine in a spare tire in a vehicle that was stopped by the Nebraska State Patrol on September 22, 1992. Special Agent Bolt's affidavit further relates information gained from a fourth confidential informant, "Source Four." Source Four informed law enforcement authorities that Neal Higdon was selling methamphetamine and that Higdon's source was Gruber.

Yet a fifth confidential informant, "Source Five," indicated that Gruber ran the drug operation for the Cedar Falls branch of the Sons of Silence and was "the money man." Source Five advised that Gruber had the connections for bringing methamphetamine to the Cedar Falls branch of the Sons of Silence. Source Five told law enforcement officers that Gruber made the arrangements

for purchasing methamphetamine and then took the money for the methamphetamine to the supplier's location. Gruber, however, usually did not bring the methamphetamine back with him but, instead, would designate a Sons of Silence member to bring the methamphetamine back with him. Source Five indicated in April 1993 he saw a "brick" of methamphetamine at Gruber's residence at 1251 175th Street, Jesup, Iowa. Source Five further related that five to ten pounds of methamphetamine was typically purchased on each trip. The methamphetamine was then "cut" to make five pounds for distribution. In the fall of 1993, Source Five advised that Dave Fairchild, the President of the Cedar Falls chapter of the Sons of Silence, purchased large quantities of methamphetamine from Gruber. On October 14, 1993, Source Five informed law enforcement authorities that Gruber and Sons of Silence member James Leisinger were leaving for the "coast" to pick up a large quantity of methamphetamine Gruber was reportedly bringing $250,000.00 with him for the purchase. On October 25, 1993, Source Five stated that Gruber had recently returned from Tennessee where he had arranged for the purchase of fifty pounds of methamphetamine.

Special Agent Bolt further avers in his affidavit that information had been obtained from Source Three that Gruber was the Sons of Silence's national vice president and that he used his position within the Sons of Silence to keep control over trafficking in methamphetamine with the Sons of Silence organization. Source Three admitted to making three deliveries of methamphetamine for Gruber to Brian McPherson, the president of the Boone, Iowa, chapter of the Sons of Silence. Source Three indicated that he picked up methamphetamine from Gruber's residence in Cedar Falls, Iowa. Source Three advised that between 1991 and 1993, Gruber ran his drug trafficking operation largely out of his residence, which was then located in Cedar Falls, Iowa. During this time Source Three had observed methamphetamine in a shoe box in Gruber's bedroom closet. He had also observed cash from drug sales in a shoe box located in Gruber's residence. Special Agent Bolt further states in his affidavit that on November 26, 1993, a law enforce-

ment officer monitored a conversation between Sons of Silence member Jerry Van-Brocklin and Gruber in which VanBrocklin made statements reflecting Gruber's possession of drugs.

The supporting affidavit of Special Agent Terra, which was employed in obtaining the second search warrant for Gruber's residence and the two search warrants for the McAllister residence, provides an overview of the Sons of Silence Motorcycle Club. Terra's affidavit also provides a detailed record of arrests and convictions of some members of the Sons of Silence. Special Agent Terra further sets forth racketeering and other criminal activities committed by members of the Sons of Silence. One Sons of Silence member, Steve Kressin, threatened and shot at William Corwin. In 1993, Sons of Silence member Calvin Flett was arrested on a charge of felon in possession of a firearm. In 1988, Sons of Silence member Nick Hursh stabbed to death Duane Niedert. In February 1991, Sons of Silence member James Truesdell was arrested on drug and weapons charges.

Special Agent Terra's affidavit further reveals that the execution of a search warrant at the residence of Sons of Silence member James Lee Truesdell resulted in the seizure of over 600 grams of methamphetamine, and over two pounds of marijuana. A search of Sons of Silence member David Fairchild's residence resulted in the seizure of a large sum of cash and drug paraphernalia. Special Agent Terra's affidavit further provides information on methamphetamine trafficking activities of Sons of Silence associates Andrew Fischels and Robert Folkers. Special Agent Terra also reveals that on November 13, 1992, Colorado law enforcement officers made a controlled buy of a quarter-pound of methamphetamine from Sons of Silence member Michael Allen.

Special Agent Terra further avers in his affidavit that information had been obtained from a confidential informant, "CI-4," that Gruber was the Sons of Silence's connection for all of the Iowa chapters of the Sons of Silence. CI-4 admitted to making deliveries of methamphetamine for Gruber to Brian McPherson. CI-4 indicated that he picked up methamphetamine from Gruber's residence in Cedar Falls, Iowa, and from a farm north of Waterloo. CI-4 further stated that

Gruber admitted to having several pounds of methamphetamine in a spare tire in a vehicle that was stopped by the Nebraska State Patrol on September 22, 1992. Special Agent Terra also reveals that Sons of Silence members Jerry VanBrocklin, James Leisinger and Sons of Silence associate Rickie Schultz were arrested in January 1993. VanBrocklin, Leisinger, and Schultz were arrested again on July 27, 1993.

Special Agent Terra's affidavit also contains information received from yet two other confidential informants, "CI–6" and "CI–7." CI–6 admitted to purchasing two and one-half ounces of methamphetamine from Sons of Silence member Jerry VanBrocklin in April and May 1993. Special Agent Terra further indicates that CI–6 personally knows the individuals distributing methamphetamine, and that information gathered from pen registers corroborates CI–6's contacts with VanBrocklin during the period in question. CI–7 indicated that in the spring of 1993 he saw five pounds of methamphetamine at Gruber's residence being broken up for distribution.

The second search warrant for the McAllister residence is supported by the affidavits of both Special Agent Terra and Special Agent Muehlstedt. Special Agent Muehlstedt avers in his affidavit that law enforcement officers had received information from a confidential informant that the Sons of Silence had a "stash house" for firearms. Muehlstedt avers that a stash house was being used because Gruber and VanBrocklin could not legally possess firearms due to their prior felony convictions. The stash house was said to be located within three or four residences of Gruber and easily accessible from Gruber's residence. Special Agent Muehlstedt notes that while executing the previously issued search warrant for the McAllister residence, law enforcement officers observed numerous firearms. He also avers that law enforcement officers observed in plain view what appeared to be an altered identification number on a motorcycle transmission in the basement.[3]

The court concludes each of the four search warrant applications clearly provided a substantial basis for the issuing magistrate to conclude that there was probable cause that contraband or evidence of illegal activity could be found at either defendant Gruber's residence, or the McAllister residence. Thus, this aspect of defendant Gruber's motion to suppress is denied.

Alternatively, even if probable cause to issue each of the four warrants did not exist, the court concludes that the searching officers' reasonable reliance on the judge's neutral and detached determination that probable cause existed counters any argument for exclusion of the seized evidence. *See United States v. Leon,* 468 U.S. 897, 914–17, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

### 3. First Amendment material

■ Defendant Gruber further challenges the February 2, 1994, warrant for his residence and the first warrant for the McAllister residence on the ground that the issuing magistrate failed to subject them to heightened scrutiny which Gruber asserts was required in light of the fact that both warrants authorized the search and seizure of indicia of membership in the Sons of Silence, which implicated defendant Gruber's First Amendment rights.[4]

---

**3.** Defendant Gruber argued at the hearing that the officers may have moved the motorcycle transmission to locate its identity number. He contends that such action would constitute a search, which had to be supported by probable cause, notwithstanding the fact that the officers were lawfully present in the McAllister residence. *See Arizona v. Hicks,* 480 U.S. 321, 324, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). The flaw in this argument is that Muehlstedt avers in his affidavit that the motorcycle transmission's identity number was in plain view. Muehlstedt Aff. at 4. This factual assertion was not contested at the evidentiary hearing. The United States Supreme Court held in *Hicks* that law enforcement officers mere recording of the serial numbers of stereo system which was observed in plain view did not constitute a seizure for Fourth Amendment purposes. *Hicks,* 480 U .S. at 324. The Court went on to note that "a truly cursory inspection—one that involves merely looking at what is already exposed to view, ...—is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion." *Id.* at 328. Similarly, here the officers observing in plain view the motorcycle transmission's identity number in the basement was not a search for Fourth Amendment purposes. *See id.*

**4.** Defendant Gruber's argument is based on the Ninth Circuit Court of Appeals' decision in *United States v. Rubio,* 727 F.2d 786 (9th Cir.1983).

In *United States v. Apker*, 705 F.2d 293 (8th Cir.), *aff'd*, *United States v. Fitzgerald*, 724 F.2d 633 (8th Cir.1983) (en banc), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 538 (1984), the Eighth Circuit Court of Appeals held that the "scrupulous exactitude" standard applied to a search not involving prior restraint but potentially implicating First Amendment associational rights.[5] *Id.* at 301. Since the *Apker* decision, however, the United States Supreme Court has held that the basis for special scrutiny given searches and seizures involving materials protected by the First Amendment is the risk posed by prior restraints. *New York v. P.J. Video, Inc.*, 475 U.S. 868, 875, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986); *Maryland v. Macon*, 472 U.S. 463, 470, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985). The Eighth Circuit Court of Appeals recognized the abrogation of *Apker* in *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1240 (8th Cir.1990). In this case, the court finds that a danger of prior restraint is not implicated by the two search warrants' authorizations to search for indicia of membership in the Sons of Silence. Thus, the particularity required by *Marcus* is not required in this case. Therefore, this aspect of defendant Gruber's motion is also denied.

#### 4. *Fruit of the poisonous tree argument*

Finally, defendant Gruber challenges the validity of the second search warrant for his residence and the McAllister residence on the ground that the respective warrant applications contained tainted information that was garnered from prior searches which were illegal. As such, defendant Gruber contends that, absent the tainted materials, probable cause for issuance of the warrants did not exist and the material garnered through the warrants must be suppressed. For the reasons outlined above, the court has concluded that the initial warrants for both the Gruber residence and the McAllister residence were valid. Therefore, because there is not "tainted" material to be removed from the warrant applications, this portion of defendant Gruber's motion to suppress is denied. The court will turn next to consideration of Gruber's Motion To Suppress Intercepted Communications.

### B. Challenges To Interception Of Wire Communications

#### 1. *Probable cause for authorizing Title III interception*

Initially, the court will determine whether Chief Judge Melloy was presented with prob-

---

In that case a federal magistrate had issued an indicia warrant authorizing the search for, and seizure of, "indicia of membership in or association with the Hell's Angels." The affidavits in support of those warrants stated the types of indicia customarily kept by members and associates of the Hell's Angels Motorcycle Club, indicated specific facts showing each individual's membership or association with the club and informed the magistrate that a grand jury indictment charging the defendants with RICO violations had been returned. *Id.* at 794. In reviewing the affidavit, the Ninth Circuit stated:

> [V]irtually all of the items described in the search warrants were "mere evidence." Therefore, in addition to examining the warrants for probable cause to believe the evidence sought would be found in the places described in the warrants, *see United States v. Flores*, 679 F.2d 173, 175 (9th Cir.1982), we must also examine the warrants for probable cause to believe there was a connection between the evidence sought and a violation of the RICO statute.

*Rubio*, 727 F.2d at 793. The court then found that the magistrate had no basis for finding probable cause to believe that the evidence sought would show a violation of the RICO statute. The only basis for finding such probable cause was that an indictment had been returned by a grand jury. The court concluded that it was the magistrate's obligation to determine whether the facts showed probable cause of RICO violations, and that the grand jury indictment alone was not sufficient to show probable cause. Thus, the warrant was invalid. *Id.* at 794–95. The affidavit in the present case is different from the one in *Rubio*. The affidavit here does not simply state that an indictment has been returned; rather, it lists facts that tend to support the conclusion that the Sons of Silence Motorcycle Club is a RICO enterprise and that association with that enterprise may be illegal. The facts given provide a magistrate with probable cause to believe such connection exists. As a result, the missing element in *Rubio*, probable cause to believe that the evidence sought is connected with a violation of the RICO statute, is present in this case.

5. The Supreme Court, in reviewing the search and subsequent seizure of articles from a newspaper office, announced that courts must apply the Fourth Amendment requirements with "particular exactitude" when First Amendment interests would be endangered by a search. *See Zurcher*, 436 U.S. at 564.

able cause for issuance of the order authorizing Title III interception. The Eighth Circuit Court of Appeals provided the following review of the history and organization of Title III in its decision in *United States v. Moore*, 41 F.3d 370 (8th Cir.1994), *cert. denied*, 514 U.S. 1121, 115 S.Ct. 1985, 131 L.Ed.2d 872 (1995):

> The federal wiretap statute was first enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, 82 Stat. 212–223, codified at 18 U.S.C. §§ 2510–2520. The law has dual purposes, "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968–2 U.S.C.C.A.N. 2112, 2153. Congress followed the constitutional standards of *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in drafting Title III. *Id.* at 2163.
>
> The statute broadly prohibits wiretaps "[e]xcept as otherwise specifically provided in this chapter." § 2511(1). It mandates detailed procedures that law enforcement officials must follow in applying for a wiretap order, see §§ 2516, 2518(1), and specific findings that a judge must make in issuing a wiretap order, *see* § 2518(3). It also specifies in detail the substantive provisions of the wiretap approval order, *see* § 2518(4), and it limits the duration of the order and any extension order, *see* § 2518(5). Finally, the statute prohibits the use of wiretap evidence in any trial "if the disclosure of that information would be in violation of this chapter." § 2515. Section 2518(10)(a) defines the disclosures prohibited by § 2515 and the standards for suppressing wiretap evidence. *See Giordano*, 416 U.S. at 524, 94 S.Ct. at 1831.

*Id.* at 374.

An application for authority to conduct electronic surveillance must include facts establishing probable cause to believe: (1) that an individual is committing, has committed, or is about to commit a particular offense, 18 U.S.C. § 2518(3)(a); (2) that communications relevant to that offense will be intercepted through the wiretap, *id.* § 2518(3)(b); and (3) that the facilities from which communications are to be intercepted are being used in connection with the commission of the offense, *id.* § 2518(3)(d). *See United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir.), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *see also United States v. Meling*, 47 F.3d 1546, 1551 (9th Cir.), *cert. denied*, 516 U.S. 843, 116 S.Ct. 130, 133 L.Ed.2d 79 (1995); *United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir.1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

■ The court begins its analysis by noting that affidavits in support of electronic surveillance orders are to be judged by the same standards as conventional search warrants; the statutory probable cause standards set out in Title III are co-extensive with the constitutional requirements embodied in the Fourth Amendment. *United States v. Falls*, 34 F.3d 674, 680 (8th Cir. 1994); *United States v. Macklin*, 902 F.2d 1320, 1324 (8th Cir.1990), *cert. denied*, 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991); *Leisure*, 844 F.2d at 1354; *United States v. Townsley*, 843 F.2d 1070, 1076 (8th Cir.1988); *see United States v. Talbert*, 706 F.2d 464, 467 (4th Cir.1983); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Falcone*, 505 F.2d 478, 481 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975). The court is further cognizant that

> [t]he application for the wire interception must be viewed in a "commonsense way" to determine if there were ample facts to establish probable cause to grant the wire interception request. "[I]n judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense."

*United States v. Kirk*, 534 F.2d 1262, 1274 (8th Cir.1976) (citation omitted); *see United States v. Williams*, 124 F.3d 411, 418 (3d Cir.1997) (" 'The government's showing is to be "tested in a practical and commonsense fashion." ' ") (quoting *United States v.*

*McGlory,* 968 F.2d 309, 345 (3d Cir.) (quoting in turn *United States v. Vento,* 533 F.2d 838, 849 (3d Cir.1976)), *cert. denied sub nom. Hauser v. United States,* 506 U.S. 956, 113 S.Ct. 415, 121 L.Ed.2d 339 (1992)); *United States v. Oriakhi,* 57 F.3d 1290, 1298 (4th Cir.) (holding that " 'the burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is "to be tested in a practical and commonsense fashion," ... that does not "hamper unduly the investigative powers of law enforcement agents." ' ") (quoting *United States v. Smith,* 31 F.3d 1294, 1297 (4th Cir.1994), *cert. denied,* 513 U.S. 1181, 115 S.Ct. 1170, 130 L.Ed.2d 1124 (1995)), *cert. denied,* 516 U.S. 952, 116 S.Ct. 400, 133 L.Ed.2d 319 (1995).

■ The seminal case of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), provides the standard an issuing court must follow in determining whether probable cause supports an application for electronic surveillance and, consequently, the duty of the reviewing court when considering the propriety of that determination:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* 462 U.S. at 238.

■ Thus, the question presented on review of an issuing judicial officer's determination is not whether the reviewing court would have issued the warrant based on the affidavit as presented, but whether the court which did issue the warrant had a " 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* at 238–39 (citation omitted). Thus, a reviewing court does not conduct a de novo review of the issuing judge's determination, but must instead afford it great deference. *Id.* at 236; *see United States v. Maxim,* 55 F.3d 394, 397 (8th Cir. 1995), *cert. denied,* 516 U.S. 903, 116 S.Ct. 265, 133 L.Ed.2d 188 (1995); *United States v. Curry,* 911 F.2d 72, 75 (8th Cir.1990), *cert. denied,* 498 U.S. 1094, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991); *United States v. Macklin,* 902 F.2d 1320, 1324 (8th Cir.1990), *cert. denied sub nom. Woods v. United States,* 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991); *see also United States v. Cusumano,* 83 F.3d 1247, 1249–50 (10th Cir.1996); *United States v. Jewell,* 60 F.3d 20, 22 (1st Cir. 1995); *United States v. Goff,* 6 F.3d 363, 366 (6th Cir.1993); *United States v. Brown,* 941 F.2d 1300, 1302 (5th Cir.), *cert. denied,* 502 U.S. 1008, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991). As the Court explained in *Gates:*

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." [*Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)]. "A grudging or negative attitude toward warrants," [*United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)], is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.,* 380 U.S. at 109.

*Gates,* 462 U.S. at 236; *see also United States v. Gladney,* 48 F.3d 309, 312 (8th Cir.1995).

As the Eighth Circuit Court of Appeals has observed:

> Probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched."

*Gladney,* 48 F.3d at 312 (quoting *United States v. Bieri,* 21 F.3d 811, 815 (8th Cir. 1994)). Equally on point is the observation of Justice (then Judge) Kennedy:

> For probable cause to exist, a magistrate need not determine that the evidence sought is *in fact* on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place. *The magistrate need only conclude that it would be reasonable*

*to seek the evidence in the place indicated in the affidavit.*

*United States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir.1985), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985) (emphasis added in part) (citations omitted). Where, as here, the issuing judge relied solely on the affidavit presented to him, " 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.' " *Gladney,* 48 F.3d at 312 (quoting *United States v. Leichtling,* 684 F.2d 553, 555 (8th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983)).

### 2. *Analysis of probable cause*

■ The court concludes from its review of Terra's affidavit that it establishes probable cause. In his affidavit Terra reviews information which was obtained during an investigation of VanBrocklin. It contains information from six separate confidential informants. The reliability of each of these informants is attested to in the affidavit. In addition, much of the information supplied by the six confidential informants is corroborated by means of pen register, and undercover surveillance. The court will review some of the information contained in Terra's affidavit. First, Source One, who personally knew the individuals distributing the methamphetamine, provided information that in April 1992, VanBrocklin was distributing a large quantity of methamphetamine, and that methamphetamine seized in a state search warrant executed on September 1, 1992, at the residence of Robert Dennis Folkers came from VanBrocklin. Source One further indicated that, based on a conversation he had with VanBrocklin and VanBrocklin's associates, VanBrocklin was Folkers' drug supplier. Finally, Source One advised that in January 1993, VanBrocklin was still selling methamphetamine and named two of VanBrocklin's distributors.

Next, Source Two, who again personally knew the individuals distributing the methamphetamine, provided information that in February 1993, VanBrocklin was not employed and was getting his money through selling drugs. Additionally, Source Two stated, as recently as September 1993, that Van-Brocklin was living with a female by the name of Cynthia Laughlin, somewhere in a cabin, and that Laughlin was a heavy user of methamphetamine. Terra's affidavit next indicates that information has been provided by Source Three that Source Four is involved in the distribution of methamphetamine, and during the spring of 1993, the primary source of Source Four's methamphetamine was Gerald VanBrocklin. Source Three further stated as recently as mid-October 1993 that VanBrocklin's source for methamphetamine was Jeff Gruber, and that Gruber controls the Sons of Silence organization's methamphetamine distribution in Iowa. Finally, Source Three indicated that during the spring of 1993, he or she overheard Van-Brocklin use the telephone at 1251 175th Street, Lot # 40, Jesup, Iowa, number 319–827–3946, to set up a drug transaction.

Source Four indicated that between April or May 1993 and June 1993 he had purchased several ounce quantities of methamphetamine from VanBrocklin to sell. Source Four further indicated that he spoke to Van-Brocklin at 319–827–3946 to arrange the purchase of controlled substances. Pen register records corroborated Source Four's information. Source Four also furnished information that Source Four was introduced to Gerald Conrad VanBrocklin in April or May of 1993, and that VanBrocklin became Source Four's supplier of methamphetamine. In mid-June 1993, Source Four then made a deal with VanBrocklin, where Source Four agreed to sell more methamphetamine for VanBrocklin and pay off the debt. Although VanBrocklin "shook hands" on this agreement, VanBrocklin never carried out his part of this deal. Source Four also stated that while dealing with VanBrocklin to obtain drugs, Source Four contacted VanBrocklin by telephone at 319–827–3946 on several occasions.

Terra's affidavit reveals that Source Five provided information to the Federal Drug Task Force in September 1993 that Source Four told Source Five that he was getting his methamphetamine from "the Number 2 man in the Sons of Silence." Finally, Terra's affidavit reveals that Source Six personally knew the individuals, he was providing information about, and had participated in methamphetamine trafficking with these individu-

als. Source Six stated that VanBrocklin deals methamphetamine for Jeff Gruber, and that Gruber was the "Funnel Point" for the Sons of Silence methamphetamine distribution in Iowa.

After reviewing Terra's affidavit and considering the applicable law, the court concludes that Terra's affidavit provided Chief Judge Melloy with a "substantial basis" for finding probable cause to believe that the named individuals were engaging in or discussing criminal activity. Therefore, this aspect of defendant Gruber's motion is denied.

### 3. Necessity Requirement

Defendant Gruber next seeks to suppress the evidence obtained as a result of the interception on the ground that the government's application to Chief Judge Melloy for the wiretap authorization failed to establish the need for electronic surveillance as required by Title III. Title III requires that applications for electronic surveillance include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "Whether the statutory requirement is met is to be determined by the issuing judge in a commonsense manner, and the determination is a finding fact, which can be reversed only if clearly erroneous." *United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir.) (quoting *Macklin*, 902 F.2d at 1327), *cert. denied*, 513 U.S. 1031, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994); *see United States v. Shaw*, 94 F.3d 438, 441 (8th Cir.1996), *cert. denied sub nom. Barnes v. United States*, — U.S. —, 117 S.Ct. 786, 136 L.Ed.2d 729 (1997); *United States v. Davis*, 882 F.2d 1334, 1343 (8th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 610 (1990). The purpose of this requirement, as Justice White observed in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), is to ensure that surreptitious interception of communications is undertaken with restraint and not "routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *accord Shaw*, 94 F.3d at 441 (holding that section 2518(1)(c) requires a showing of necessity to

insure "'that wiretaps are not routinely employed as the initial step in an investigation.'") (quoting *Macklin*, 902 F.2d at 1326); *accord United States v. Nguyen*, 46 F.3d 781, 782 (8th Cir.1995).

■ The Eighth Circuit Court of Appeals, however, has pointed out that

this court has consistently held that satisfying the provisions of section 2518(1)(c) and (3)(c) does not require the government to exhaust every available investigative technique before a wiretap may be authorized. In *United States v. Losing*, 560 F.2d 906 (8th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977), we said:

Congress did not require the exhaustion of "specific" or "all possible" investigative techniques before wiretap orders could be issued.... Sections 2518(1)(c) and 2518(3)(c) are only designed to ensure that wiretapping is "not to be routinely employed as the initial step in criminal investigation" and "... to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."

560 F.2d at 910 (quoting *Daly*, 535 F.2d at 438).

*United States v. O'Connell*, 841 F.2d 1408, 1414 (8th Cir.), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988). "[W]hile the statute does require that normal investigative procedures be used first, it does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap." *Macklin*, 902 F.2d at 1326; *accord Williams*, 124 F.3d at 418; *Shaw*, 94 F.3d at 441; *United States v. Barnes*, 47 F.3d 963, 965 (8th Cir.1995); *Falls*, 34 F.3d at 682; *Leisure*, 844 F.2d at 1356; *O'Connell*, 841 F.2d at 1415; *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir.), *cert. denied*, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 202 (1987); *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir.), *cert. denied sub nom., Hoskins v. United States*, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). Thus, the law is clear in this circuit that the requirements of section 2518 were not intended to turn electronic surveillance

into a tool of last resort. *Macklin*, 902 F.2d at 1326; *United States v. Matya*, 541 F.2d 741, 745 (8th Cir.1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977); *see also United States v. Martino*, 664 F.2d 860, 868 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). Instead, courts have concluded that "it is sufficient if there is evidence that 'normal investigative techniques ... reasonably appear to be unlikely to succeed if tried.'" *Williams*, 124 F.3d at 418 (quoting 18 U.S.C. § 2518(3)(c)). "'The government need only lay a "factual predicate" sufficient to inform the judge why other methods of investigation are not sufficient.'" *Id.* (quoting *McGlory*, 968 F.2d at 345) (quoting in turn *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.), *cert. denied sub nom. Conti v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975)).

▬ Turning to Special Agent Terra's affidavit, the affidavit states that before applying for the wiretap authorization, the investigation had consisted of confidential informants, physical surveillance, telephone pen registers, and telephone toll records. The affidavit also sets forth that witnesses in the case would be unlikely to testify voluntarily. In fact, several of the witnesses who did provide information did so only upon the assurance that their identities would not be disclosed and that they would not be called to testify. Furthermore, one individual committed suicide shortly after being contacted about cooperating in the investigation, and another individual, who was offered immunity, chose to accept a lengthy prison sentence instead of cooperation. The affidavit also stated that the location of surveillance of VanBrocklin's home was made difficult by its location. VanBrocklin had approached officers three times while the officers were attempting to conduct surveillance near his home. Thus, the affidavit details ways in which the pre-application investigation had resulted in an incomplete picture of the drug-trafficking organization that was the target of the investigation. The Eighth Circuit Court of Appeals has affirmed the granting of wiretaps under similar circumstances. *See Shaw*, 94 F.3d at 441–42 (affirming denial of motion to suppress wiretap evidence of a tight-knit,

violent group where law enforcement authorities had attempted to infiltrate the organization for more than three years before applying for a wiretap; ordinary measures, "such as interviews with witnesses, confidential informants, surveillance, and pen registers, had proved unsuccessful;" and "other measures, such as search warrants and increased undercover operations, were deemed either likely to fail or too dangerous."); *Nguyen*, 46 F.3d at 782 (affirming wiretap where defendants were believed to be a tight-knit group which would be difficult for an undercover officer to penetrate, and the government had tried using pen registers, confidential informants, surveillance, and garbage searches before applying for a wiretap).

The court is convinced that the government's October 16, 1993, application for the authorization for wire interception more than satisfied the requirements of section 2518. As was pointed out above, the law in this circuit is clear that the requirements of section 2518 were not intended to turn electronic surveillance into a tool of last resort. *See Shaw*, 94 F.3d at 441; *Macklin*, 902 F.2d at 1326; *Matya*, 541 F.2d at 745; *see also Martino*, 664 F.2d at 868. Given that the Terra affidavit set forth both previous investigative efforts and how important information concerning the organization in this case had not been disclosed by those efforts, the court concludes that the government's application satisfied the requirements of 18 U.S.C. § 2518(3)(c). Accordingly, this portion of defendant Gruber's motion to suppress is denied.

#### 4. Gruber's facial challenges to interception order and extensions

The court will next take up defendant Gruber's assertions regarding alleged defects which appear on the face of the order or extension of the order authorizing interception. Specifically, Gruber asserts that the order authorizing the interception of communications fails to identify the individuals whose communications may be intercepted. Gruber further asserts that the extension orders fail to sufficiently authorize the inter-

ception of communications and fail to provide for minimization.

■ " 'A wiretap authorization order is presumed proper,' and Defendants carry the burden of overcoming this presumption." *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir.1995) (quoting *United States v. Mondragon*, 52 F.3d 291, 292 (10th Cir.1995) )(quoting in turn *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir.), *cert. denied*, 493 U.S. 981, 110 S.Ct. 513, 107 L.Ed.2d 515 (1989)), *cert. denied sub nom. Chaplin v. United States*, 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996); *accord United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 393, 139 L.Ed.2d 307 (1997); *United States v. Castillo–Garcia*, 117 F.3d 1179, 1185 (10th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 395, 139 L.Ed.2d 309 (1997); *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir.1995); *United States v. Williams*, 45 F.3d 1481, 1484 (10th Cir.1995); *see also United States v. Newman*, 733 F.2d 1395, 1398 (10th Cir.1984); *United States v. Feldman*, 535 F.2d 1175, 1180–81 (9th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976). Although the requirements of Title III should be strictly observed, not "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.' " *United States .v. Chavez*, 416 U.S. 562, 574–75, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Defendants must not only demonstrate a deviation from the statutory requirements of Title III, but this deviation must be substantial. *United States v. Moore*, 41 F.3d 370, 374 (8th Cir. 1994), *cert. denied*, 514 U.S. 1121, 115 S.Ct. 1985, 131 L.Ed.2d 872 (1995); *see United States v. Cunningham*, 113 F.3d 289, 293 (1st Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 165, 139 L.Ed.2d 109 (1997); *United States v. Traitz*, 871 F.2d 368, 369 (3d Cir.), *cert. denied*, 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989); *United States v. Swann*, 526 F.2d 147, 149 (9th Cir.1975); *United States v. Joseph*, 519 F.2d 1068, 1070 (5th Cir.), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976); *United States v. Vigi*, 515 F.2d 290, 293 (6th Cir.), *cert. denied*, 423 U.S. 912, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975).

Under 18 U.S.C. § 2518(4)(a), each wiretap order must specify "the identity of the person, if known, whose communications are to be intercepted." Defendant Gruber asserts that Chief Judge Melloy's orders fail to comply with section 2518(4)(a). Both the original order authorizing interception filed on October 16, 1993, and the extension of that order filed on November 15, 1993, clearly meet the requirements of section 2518(4)(a). The original order identifies "Gerald Conrad Van-Brocklin, aka 'Jerry' or 'J.V.'; Cynthia Marie Laughlin, aka 'Cyndi'; Jeffrey Paul Gruber aka 'No Mind', and others yet unknown ..." Similarly, the extension order identifies "Gerald Conrad VanBrocklin, aka 'Jerry' or 'J.V.'; Cynthia Maria Laughlin, aka 'Cyndi'; Jeffrey Paul Gruber, aka 'No Mind'; David Lester Fairchild, aka 'Hocus'; James Lee Leisinger, aka 'Crazy'; Rollyn Brent Luethje; Scott Leo Laughlin; Christine Marie Peverill aka 'Casper,' and others yet unknown ..." as individuals for whom probable cause had been developed. Thus, the original order and the extension both fully complied with section 2518(4)(a).

■ Defendant Gruber further challenges the validity of Chief Judge Melloy's December 14, 1993, order which was issued during the period of interception authorized by the original order and the extension. The December 14, 1993, order was sought pursuant to 18 U.S.C. § 2517(5). Title III clearly contemplates that law enforcement officials will, in the course of intercepting conversations related to specified target offenses, intercept conversations "relating to offenses other than those specified in the order of authorization or approval." *See* 18 U.S.C. § 2517(5). For example, an intercepted conversation can relate to both a specified offense and to an unspecified offense. Under 18 U.S.C. § 2517(5), the government may secure a court's blessing to disclose the contents of an "other offense" interception in connection with a federal prosecution. *See United States v. Barnes*, 47 F.3d 963, 964 (8th Cir.1995). As the Eighth Circuit explained in *Barnes*:

> The danger inherent in disclosure without judicial approval is that the original application may have been a subterfuge, that is,

the government, not having probable cause to obtain a wiretap for some crime, might obtain it by purporting to investigate a different crime. We have acknowledged the potential for this kind of abuse.

*Id.* at 964 (citing *United States v. Sedovic,* 679 F.2d 1233, 1237 n. 4 (8th Cir.1982)). The relevant statutory provision, however, permits disclosure when the interception has been "authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of [Title III]. Such application shall be made as soon as practicable." 18 U.S.C. § 2517(5). It is settled that disclosure authorization "can be implicitly obtained when a judge grants a renewal of a wiretap after being advised of the essential facts of the unspecified violation." *United States v. McKinnon,* 721 F.2d 19, 23–24 (1st Cir.1983). Furthermore, judicial approval of an interception of evidence relating to unauthorized offenses can be retroactively granted. *Barnes,* 47 F.3d at 965.

Here, this standard was clearly met. The initial wiretap authorization in this case was made by Chief Judge Melloy in this district on October 16, 1993. Chief Judge Melloy's initial order indicated that there was probable cause to believe that the targeted subjects had committed or were committing:

> offenses involving the distribution of and possession with intent to distribute controlled substances, to wit: methamphetamine; conspiracy to distribute and possess with intent to distribute methamphetamine; and the unlawful use of a communication facility (telephone) to facilitate these violations of drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1), 846 and 843(b).

Order of Oct. 16, 1993, at 1.

The court further notes that the November 15, 1993, order extending authorization contained the same authorized offenses. On December 10, 1993, Chief Judge Melloy was contacted by the government and informed of a conversation relating to possible offenses of obstruction of justice, destruction of evidence and the making of false statements to a law enforcement officer. The government then sought permission to continue to intercept conversations related to these offenses. As a result, the judicial officer was "made aware of the 'material facts constituting or clearly relating to' " these possible violations by the government. Thus, the December 14, 1993, order added these offenses as authorized offenses. Accordingly, this aspect of defendant Gruber's motion to suppress is denied.

### 5. *Minimization*

Defendant Gruber also asserts that law enforcement officers failed to properly minimize calls during the monitoring of conversations and that this action warrants suppression. Title III provides that electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). This statutory provision implements "the constitutional mandate ... that wiretapping must be conducted with particularity." *United States v. Daly,* 535 F.2d 434, 440 (8th Cir.1976). The minimization requirement requires the government to reduce, to the maximum extent possible, the interception of communications other than those it has authority to intercept. *Macklin,* 902 F.2d at 1328; *Daly,* 535 F.2d at 441. Section 2518(5) was enacted to comply with the mandate of *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), that wiretapping be conducted with particularity. *United States v. Garcia,* 785 F.2d 214, 224 (8th Cir.), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986); *Daly,* 535 F.2d at 440.

"Whether minimization has taken place depends upon 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time.' " *United States v. Fregoso,* 60 F.3d 1314, 1323 (8th Cir.1995) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)). Each case must be examined on its own particular facts. *Scott,* 436 U.S. at 140–41; *United States v. Ozar,* 50 F.3d 1440, 1447 (8th Cir.1995); *Garcia,* 785 F.2d at 224 (quoting *Scott,* 436 U.S. at 139); *United States v. O'Connell,* 841 F.2d at 1416; *Daly,* 535 F.2d at 441. "Relevant considerations include the number of target individuals, the ambiguity of the intercepted

conversations, the complexity of the acts under investigation, and the extent of the issuing judge's involvement in the surveillance." *Ozar*, 50 F.3d at 1447; *see Macklin*, 902 F.2d at 1327; *see also O'Connell*, 841 F.2d at 1416–17; *Garcia*, 785 F.2d at 224. Additionally, " '[w]hen the investigation is focusing on what is thought to be a wide-spread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly intercepted because they will involve one or more of the co-conspirators.' " *Ozar*, 50 F.3d at 1447 (quoting *Scott*, 436 U.S. at 140). Where, as here, the adequacy of the government's minimization effort is challenged, the government has the burden of proving proper minimization. *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir.), *cert. denied*, 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 228 (1990); *United States v. Armocida*, 515 F.2d 29, 43 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975) (quoting *Berger*, 388 U.S. at 57); *United States v. Rizzo*, 491 F.2d 215, 217 (2d Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

 Chief Judge Melloy's original authorization order incorporated section 2518(5)'s minimization requirement by providing:

> IT IS FURTHER ORDERED that monitoring of conversations must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code. Interception must be suspended immediately when it is determined, through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent shall spot check to ensure that the conversation has not turned to criminal matters.

Thus, the record shows that agents were specifically apprised of minimization procedures to be employed in a Title III investigation. Furthermore, defendant Gruber has

not specified which calls he alleges were not properly minimized. A defendant must make at least some initial showing of contested facts before the government will be put to its burden of proof. *See United States v. Giacalone*, 853 F.2d 470, 482 (6th Cir.), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). Defendant Gruber has failed to make such a showing in this case. The court concludes that this aspect of Gruber's motion to suppress is denied.

### 6. *Franks issue*

Finally, defendant Gruber challenges the interception on the grounds that the application contained false statements or material omissions in violation of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks*, the Supreme Court held that the inclusion of an intentionally or recklessly false statement of fact necessary for the determination of probable cause may constitute grounds for suppression. *Id.* 438 U.S. at 155–56; *see United States v. Falls*, 34 F.3d 674, 681 (8th Cir.1994). A *Franks* hearing permits a defendant to challenge the veracity of a search warrant affidavit. *Franks*, 438 U.S. at 156. Defendants bear the burden of proving the intentional or reckless inclusion of false statements in a warrant affidavit. *United States v. Ozar*, 50 F.3d 1440, 1445 (8th Cir.1995); *United States v. Garcia*, 785 F.2d 214, 222 (8th Cir.), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986).

 In *Franks*, the Supreme Court enunciated its now familiar standard for challenges to inaccurate information contained in a warrant application.

> [W]e hold that, where defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with a reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by a preponderance of the evidence, and with the affidavit's false material set to one side,

the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155–56.[6] In order to successfully challenge a warrant affidavit under *Franks*, a defendant must show:

> 1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit, and 2) that the affidavit's remaining content is insufficient to . establish probable cause. The same analysis applies to omissions of fact. The defendant must show: 1) that facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and 2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.

*Gladney*, 48 F.3d at 313 (quoting *United States v. Humphreys*, 982 F.2d 254, 258 n. 2 (8th Cir.1992)); *accord United States v. LaMorie*, 100 F.3d 547, 554 (8th Cir.1996); *Falls*, 34 F.3d at 681; *United States v. Lucht*, 18 F.3d 541, 546 (8th Cir.1994); *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir.1986); *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir.1986). Reckless disregard may be inferred where the omitted information was " 'clearly critical' to the fading of probable cause ..." *Reivich*, 793 F.2d at 961; *accord Rivera v. United States*, 928 F.2d 592, 604 (2d Cir.1991); *see United States v. Cronan*, 937 F.2d 163, 165 (5th Cir.1991); *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir.1990); *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir.1990).

▓▓ Defendant Gruber challenges Special Agent Terra's failure to identify confidential informant number six as a member of the Sons of Silence in his affidavit. Confidential informant number six was identified by the government at the hearing as Cory Pendarvis. Defendant Gruber asserts that this omission was material on the necessity requirement and that such information, if properly disclosed to Chief Judge Melloy, would have contradicted statements in Terra's affidavit regarding the inability of law enforcement officers to effectively employ traditional investigative methods to obtain evidence against defendant Gruber and his co-defendants.

The court finds no evidence in this case that Special Agent Terra knowingly failed to identify confidential informant number six as a Sons of Silence member for the purpose of keeping relevant information from Chief Judge Melloy. The court has found that Special Agent Terra decided to omit the fact that confidential informant number six was a member of the Sons of Silence because he was concerned that Pendarvis's life would be endangered in the event that his Title III affidavit was unsealed prior to indictment. However, at the evidentiary hearing, neither Special Agent Terra nor the government could identify a single instance where a Title III affidavit had been unsealed prior to the return of an indictment. Thus, the court finds Special Agent Terra's reason for omitting the information regarding confidential informant number six's Sons of Silence membership to be objectively unreasonable. Nonetheless, although the court does not condone the action, this was not an attempt to enhance the contents of the affidavit submitted in support of the Tittle III application. Rather, it was a measure employed in order to mask Pendarvis's identity for his own safety.

**6.** Although *Franks* was not a Title III case, *Franks* has been applied in Title III cases in the Eighth Circuit Court of Appeals as well as other circuits. *See e.g., United States v. Garcia*, 785 F.2d 214, 222 (8th Cir.), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986); *United States v. Leisure*, 844 F.2d 1347, 1357 (8th Cir.), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir.1985); *United States v. Brooklier*, 685 F.2d 1208, 1221 (9th Cir.1982), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983). While the court has located no cases applying a *Franks* analysis to a necessity requirement challenge, the court will nonetheless proceed to conduct a *Franks* analysis here. The court has modified the second part of the *Franks* analysis and will require defendant Gruber to demonstrate: 1) that facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and 2) that the affidavit, if supplemented by the omitted information, could not support a fading that the necessity requirement had been established.

Assuming that Special Agent Terra's omission was made with at least a reckless disregard for whether it made the interception application misleading, the court concludes that the omission was not material. Even if Pendarvis's membership in the Sons of Silence would have been included in the wiretap application, there would still have been ample reason to conclude that normal investigative procedures had failed or were likely to do so. While Pendarvis was a member of the Sons of Silence, he was not a member of the Sons of Silence's Waterloo–Cedar Falls Chapter. Instead, Pendarvis was a member of the Boone Chapter. The significance of this fact is that Pendarvis's knowledge of the drug distribution network was limited to his contacts with Gruber and McPherson. As a result, Pendarvis did not have intimate knowledge of the drug distribution system within the Waterloo–Cedar Falls Chapter. Moreover, Pendarvis was attempting to extricate himself from the Sons of Silence organization and therefore was not in a position to actively provide cooperation with the investigation. Thus, Pendarvis had limited knowledge and an even more limited ability to be of assistance in the investigation. Therefore, the court concludes even if Special Agent Terra had included Pendarvis's membership in the Sons of Silence in the wiretap application, sufficient evidence to meet the necessity requirement existed in this case, and this aspect of defendant Gruber's motion is also denied.

### IV. CONCLUSION

Initially, the court concludes that each the four challenged search warrants provided the executing law enforcement officers with considerable guidance, directing them what to search for and seize. The court further concludes that each of the four search warrant applications clearly provided a substantial basis for the issuing magistrate to conclude that there was probable cause that contraband or evidence of illegal activity could be found at either defendant Gruber's residence, or the McAllister residence. The court also finds that neither the February 2, 1994, warrant for Gruber's residence nor the first warrant for the McAllister residence were required to be subjected to heightened scrutiny because both warrants authorized the search

and seizure of indicia of membership in the Sons of Silence, which implicated defendant Gruber's First Amendment rights. Additionally, the court concludes that the initial warrants for both the Gruber residence and the McAllister residence were valid and there was no "tainted" material contained in the warrant applications. Therefore, defendant Gruber's Combined Motion To Suppress is denied. With regard to Gruber's Motion To Suppress Intercepted Communications, the court concludes that probable cause existed for issuance for the authorizations. The court further finds that the necessity requirement for the wiretaps has been met in this case. Next, the court concludes that each wiretap order complied with section 2518(4)(a) by specifying the identity of the person whose communications were to be intercepted. The court further finds that the minimization requirement was been satisfied in this case. Finally, the court determines that the applications did not contain false statements in violation of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Therefore, the court denies, on all grounds, defendant Gruber's Motion To Suppress Intercepted Communications.

**IT IS SO ORDERED.**