# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No.  98-2311

_____

United States of America,             *
                                       *
          Appellee,                    *
                                       *
     v.                                *
                                       *
Timothy R. Fairchild,                  *
                                       *
          Appellant.                   *

                                              Appeals from the United States
                                              District Court for the Northern
                                              District of Iowa.

_____

No. 98-2330

_____

United States of America,             *
                                       *
          Appellee,                    *
                                       *
     v.                                *
                                       *
Jeffrey Paul Gruber, also known as     *
No Mind, also known as The King, also  *
known as Boss,                         *
                                       *
          Appellant.                   *

_____

Submitted:  January 12, 1999
Filed:  September 7, 1999
_____

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

HANSEN, Circuit Judge.

After a trial in district court,[1] a jury found Jeffrey Paul Gruber guilty of various drug trafficking offenses, a firearm violation, money laundering, racketeering, and engaging in a continuing criminal enterprise.  The district court sentenced Gruber to life in prison on the racketeering and criminal enterprise counts, and to lesser concurrent terms of imprisonment on the other counts of conviction.  Gruber received  a provisional sentence of life in prison on the drug conspiracy conviction.  Timothy R. Fairchild, Gruber's codefendant, pleaded guilty to conspiracy to distribute and possess with intent to distribute methamphetamine.  The district court sentenced Fairchild to 135 months in prison.  Gruber appeals both his convictions and his sentences.  Fairchild appeals aspects of his sentence.  We affirm the judgments of the district court but remand Gruber's drug conspiracy conviction and sentence for vacation to avoid double jeopardy.

## I.
### Facts and Background

_____

[1]The Honorable Michael J. Melloy, Chief Judge, United States District Court for the Northern District of Iowa, presiding.

About 20 years ago, Gruber formally affiliated with a motorcycle club known as the Sons of Silence. Sons of Silence members pledge oaths of loyalty, secrecy, and commitment to their common bonds of brotherhood. Their brotherhood, however, as this case demonstrates, enforces its oaths through violence and other nefarious activity.

Gruber rose to prominence in the Sons of Silence, became a national vice-president, and was the de facto leader of the organization's Cedar Falls/Waterloo, Iowa chapter. In the 1980's, Gruber utilized his position within the Sons of Silence to engage in an illegal drug trafficking enterprise. The drug trafficking activity consisted of numerous interstate transactions involving large amounts of money and methamphetamine. David Fairchild (who is no relation to defendant Timothy R. Fairchild) also was a high ranking member of the Sons of Silence and became the defendant Jeffrey Gruber's partner in the interstate drug trade. David Fairchild was convicted after a jury trial in 1995 of numerous drug, money laundering, and racketeering offenses and received a 300-month sentence. His convictions were affirmed by this court. See United States v. Fairchild, 122 F.3d 605 (8th Cir. 1997), cert. denied, 118 S. Ct. 1086 (1998). After his conviction, David Fairchild began to cooperate with the government and testified against defendant Jeffrey Gruber when Gruber was later apprehended. David Fairchild testified that his involvement with Gruber began in 1986 with the transporting of money and drugs between Kentucky and Iowa for Gruber's brother, Ron. David Fairchild was told by Ron Gruber that the methamphetamine he was transporting (in three to six pound quantities per trip) belonged to the defendant Jeff Gruber. Later, after the two Gruber brothers had a falling out, David Fairchild began dealing directly with and transporting drugs and money directly for the defendant Jeff Gruber between Iowa and Colorado. After David Fairchild's house was searched by law enforcement authorities in 1992, he and the defendant Jeff Gruber began using another gang member to do the drug transportation work. Other former Sons of Silence members, including a national officer, testified that they often received distributable quantities of methamphetamine from Jeffrey Gruber, which they in turn sold to other members. Throughout the 1980's and early 1990's, the

defendant Gruber and other Sons of Silence members regularly and routinely shipped illegal drugs and money in and between at least four states.

Gruber and the other members of his drug trafficking cadre spent the proceeds of their illegal operation on real property, vehicles, and motorcycles. Gruber, for example, purchased a Harley-Davidson motorcycle for $15,123.80 in cash, a Ford Bronco for $7,000 in cash, and a house in Cedar Falls for $13,500 in cash.

Gruber commanded the loyalty of his drug associates through threats and actual violence. On one occasion, Gruber "earnotched" an associate by taking a knife and cutting out part of the associate's ear for disciplinary reasons. On another occasion, Gruber beat an associate almost to the point of death. An eyewitness described the beating as so savage that the associate required extensive hospitalization and reconstructive surgery. On other occasions, Gruber attacked and beat his associates with baseball bats.

Knives and bats were not the only weapons in Gruber's arsenal. Firearms played a prominent role in the Cedar Falls/Waterloo chapter events. (See Jeff Gruber Trial Tr. at 134-35, 212-13, 394.) More importantly, Gruber employed firearms as a method of ensuring the secrecy of his illicit drug operation. Gruber more than once threatened to murder his associates with a firearm if they betrayed him to law enforcement. On another occasion, he severely pistol-whipped an associate. A search of Gruber's residence revealed 50 rounds of .22 caliber maximags. A search of another Sons of Silence drug trafficker's cabin yielded 32 firearms, all of which were owned by Gruber.

A grand jury indicted Gruber and 13 of his associates in November 1994. Most, but not all of the associates, were immediately arrested. Gruber was not found and became a fugitive; he was seen (but not apprehended) in 1995 in Costa Rica and was finally arrested in Tacoma, Washington in July 1996. In the meantime, David Fairchild

and twelve others had either gone to trial or pleaded guilty and been convicted. A second superceding indictment was returned by the grand jury in September 1997, and was the indictment Gruber was tried upon in February 1998. The jury found Gruber guilty of all the charges made against him after an eight-day trial. On appeal, Gruber alleges that the district court erred when it denied his motion to suppress evidence obtained during a wiretap, the government erroneously charged him as an enterprise under the Racketeer Influenced and Corrupt Organizations Act, the government violated his due process rights by compensating the witnesses who testified against him, the district court erred when it determined the type and quantity of methamphetamine for sentencing purposes, and the district court erred when it imposed a two-level enhancement for possession of a firearm during the course of a drug conspiracy. Timothy Fairchild argues that the district court erred by double-counting his criminal history and denying his motion for a downward departure.

## II.
## Gruber's Challenges

## A.
## The Wiretap

The government electronically monitored the telephone of Gerald VanBrocklin. VanBrocklin was a member of the Cedar Falls/Waterloo Sons of Silence chapter and an associate of Gruber's. The wiretap of VanBrocklin's telephone line intercepted Gruber's conversations with VanBrocklin regarding the Sons of Silence methamphetamine operation. The district court had ordered the wiretapping of VanBrocklin's telephone and authorized the interception of VanBrocklin's and Gruber's conversations after the government presented the district court with an application and a supporting affidavit. Following his arrest, Gruber filed a motion to suppress the

intercepted information. The district court[2] denied his motion. See United States v. Gruber, 994 F. Supp. 1026 (N.D. Iowa 1998). On appeal, Gruber contends that the wiretap orders were invalid because they failed to specify the person whose communications might be intercepted and they did not conform to the minimization requirements of 18 U.S.C. § 2518(5). Gruber also argues that the wiretap application was not supported by probable cause. We review the facts underlying a district court's decision to deny a suppression motion for clear error. See United States v. Searcy, No. 98-3524, 1999 WL 424377, at *3 (8th Cir. June 25, 1999). We review de novo a district court's legal conclusions regarding a suppression motion. See id.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, generally prohibits the government from conducting wiretap investigations without first obtaining an approval order from a judicial officer. Obtaining such an order requires the government to present the court with facts sufficient to establish probable cause that a wiretap will yield information concerning the commission of a particular offense by an identified individual. See 18 U.S.C. § 2518(3)(a), (b). Once the district court determines that probable cause exists, it may issue an order authorizing the wiretap. The wiretap order must specify: (a) the identity of the person, if known, whose communications will be intercepted; (b) the location of the facilities where authority to intercept communications is permitted; (c) a description of the types of communications that are expected to be intercepted and the offense to which they relate; (d) the name of the person authorizing the application and the name of the government agency authorized to intercept the communications; and (e) the period of time for which the wiretap is authorized. See 18 U.S.C. § 2518(4)(a)-(e). The statute also mandates that every order contain a provision requiring the government to minimize the interception of communications unrelated to the illegal activity

_____

[2]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa. Although Chief Judge Melloy presided over most aspects of this case, Judge Bennett decided the pretrial suppression issues.

specified in the application. See 18 U.S.C. § 2518(5). Wiretap orders are valid for no more than 30-day intervals, but the orders may be renewed upon an application for an extension of time with the court. See id. Each extension request must meet the same probable cause requirements as the original application. See id.

Gruber contends that the district court's orders are invalid because they failed to comply with the requirements set forth in 18 U.S.C. § 2518(4) and the minimization standards delineated in 18 U.S.C. § 2518(5). We note, however, that a party challenging the validity of a federal wiretap order must show a substantial, not just technical, deviation from the requirements of the statute. See United States v. Moore, 41 F.3d 370, 374-76 (8th Cir. 1994), cert. denied, 514 U.S. 1121 (1995).

In this case, we find no defect in the district court's orders. On October 16, 1993, the government sought a wiretap order from the district court. The district court granted the government's request and issued an order authorizing the wiretap after finding probable cause to believe that VanBrocklin, Cynthia Maria Laughlin, Jeff Gruber, and "others yet unknown" were engaged in drug trafficking activity and the unlawful use of the telephone in order to facilitate drug trafficking activity. See Gruber, 994 F. Supp. at 1034. The order specified Gruber as one of the persons whose telephone communications were authorized to be intercepted. The order described the location of the monitored phone line, the agency authorized to intercept the communications, and the type of offenses that the government agents believed that the wiretap would uncover. The order also contained a strongly worded minimization requirement, a statement regarding the basis for probable cause, and a statement indicating that the order would terminate in 30 days. On November 15, 1993, the government sought a 30-day extension from the district court. The district court issued an extension order that mirrored the initial order. On December 10, 1993, the government informed the district court that it intercepted a conversation revealing further possible offenses including obstruction of justice, destruction of evidence, and the crime of making false statements to government agents. The government asked the

district court to amend its order to permit authorization of the wiretap for the additional offenses. On December 14, 1993, the district court issued an amended order that authorized a wiretap for the additional offenses. A United States District Judge signed each order.

After reviewing the district court's authorization orders, we find that they meet or exceed the requirements of the statute. Gruber's claims of invalidity are simply not supported by the record. Hence, Gruber's challenge to the sufficiency of the district court's orders fails for the detailed reasons set forth in the district court's order denying the motion to suppress.[3] See Gruber, 994 F. Supp. at 1031-35, 1040-50.

Gruber also alleges that the government's application for a wiretap lacked sufficient probable cause for the district court to conclude that interception of the designated telephone communications would reveal the existence of a criminal offense. We evaluate probable cause for the issuance of a wiretap under the same standard that we use to evaluate probable cause for the issuance of a search warrant. See United States v. Garcia, 785 F.2d 214, 221-22 (8th Cir.), cert. denied, 475 U.S. 1143 (1986). Specifically, probable cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime. Cf. Illinois v. Gates, 462 U.S. 213, 238 (1983). In this case, the government's wiretap application included an affidavit from a federal agent. The affidavit indicated that VanBrocklin, Gruber, and their associates sold large quantities of methamphetamine. The affidavit listed six confidential informants who provided personal knowledge of the Sons of Silence's drug trafficking operation, VanBrocklin's residence, and the fact that

---

[3]Gruber also argues that the district court's wiretap order is deficient because it does not contain a statement that normal investigative procedures were either unsuccessful, or not likely to be successful, or too dangerous. See 18 U.S.C. § 2518(3)(c). Gruber's argument is not supported by the record and no further discussion of this issue is warranted. See Eighth Circuit Rule 47B.

VanBrocklin contacted his drug sources via the telephone. Two of the confidential informants specifically identified Gruber as the source of the Sons of Silence's methamphetamine distribution activities in Iowa. The telephone number supplied by the informant was registered to VanBrocklin's home. Pen register records and undercover surveillance corroborated most of the confidential informants' information and provided additional bases for probable cause. Most notably, the pen register records revealed 96 calls from VanBrocklin's home telephone to Gruber. Based upon the totality of the circumstances, a reasonable jurist could conclude that more than sufficient evidence existed to establish probable cause that a wiretap placed on VanBrocklin's telephone line would uncover evidence of a crime.

Gruber argues that the government's wiretap application lacked probable cause for the district court to conclude that he was engaged in the racketeering activities described in the federal agent's affidavit. Gruber contends that without probable cause to believe that he personally was engaged in the criminal activity, the government should not have monitored his telephone conversations. Gruber's contention lacks merit. In this case, the district court had more than sufficient probable cause to believe that Gruber was involved in the criminal activity described in the government's wiretap application. The federal agent's affidavit lists two confidential informants who specifically identified Gruber as the source of the methamphetamine sold by VanBrocklin. See Gruber, 994 F. Supp. at 1033-34, 1043-44. One informant stated that "as recently as mid-October 1993 that VanBrocklin's source for methamphetamine [was] Jeff Gruber . . . and that Gruber control[led] the organization's methamphetamine distribution in Iowa." Id. at 1033. Another informant stated that VanBrocklin sold methamphetamine for Gruber and that Gruber was the "funnel point" for the Sons of Silence's methamphetamine trafficking operation in Iowa. See id. at 1034. In addition, the pen register records revealed 96 calls from VanBrocklin's home telephone to Gruber. The pen register records coupled with the informants' identifications more than satisfy the probable cause threshold necessary to permit the district court to list Gruber in its wiretap order as one whose communications were to be intercepted and to enable

federal agents to monitor Gruber's telephone conversations involving the methamphetamine conspiracy. Accordingly, we reject Gruber's challenge to the sufficiency of the government's wiretap application. Our agreement with the district court's finding of probable cause, as to Gruber specifically, precludes the need to address whether the government agents would have violated the federal wiretap statute by monitoring the telephone conversations of unknown and previously unidentified individuals for whom the agents lacked probable cause to believe, at the time the wiretap order was secured, were involved in the identified drug offenses. Gruber was not in that group of unknowns.

## B.
## The RICO Challenge

Gruber contends that the government's superceding indictment erroneously charges him as both an individual and an enterprise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Gruber argues that he cannot be both a person and an enterprise for the purposes of RICO. The district court denied Gruber's request to dismiss the portions of the superceding indictment relating to RICO. We review the district court's statutory interpretation de novo. See United States v. Williams, 136 F.3d 547, 550 (8th Cir. 1998), cert. denied, 119 S. Ct. 1139 (1999).

RICO provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt." 18 U.S.C. § 1962(c). RICO requires the government to show both the existence of an enterprise, and the defendant's engagement in a pattern of racketeering activity while employed by or associated with the enterprise. See United States v. Turkette, 452 U.S. 576, 583 (1981). "[T]he person named as the defendant cannot also be the entity

identified as the enterprise." Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 995 (8th Cir.1989).

In this case, the government's superceding indictment charges Gruber and his associates as persons under 18 U.S.C. § 1962(c). The same indictment also charges Gruber and his associates as an enterprise. Gruber contends that such a charge is improper because "the enterprise and the named defendant must be distinct entities." (Gruber's Br. at 31.) Gruber cites Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 883 F.2d 132 (D.C. Cir. 1989), cert. denied, 501 U.S. 1222 (1991), and Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago, 747 F.2d 384 (7th Cir. 1984), aff'd, 473 U.S. 606 (1985), for the proposition that the government's superceding indictment is improper. Gruber's reliance on Yellow Bus and Haroco is misplaced.

Yellow Bus and Haroco involved instances in which an indictment charged a single corporation as both a person and an enterprise under RICO. See Yellow Bus, 883 F.2d at 139-41; Haroco, 747 F.2d at 399-402. The indictment in the instant case is quite different. While the superceding indictment in this case charges several defendants individually as persons, it does not charge any defendant *singularly* as an enterprise. Hence, no defendant is both a person and an enterprise. Gruber and each of his associates are persons associated with the Sons of Silence enterprise. Collectively, Gruber and his associates are the Sons of Silence. "A collective entity is something more than the members of which it is comprised." Atlas Pile Driving, 886 F.2d at 995. Although a defendant may not be both a person and an enterprise, a defendant may be both a person and a part of an enterprise. In such a case, the individual defendant is distinct from the organizational entity. In this case, Gruber *singularly* does not constitute the Sons of Silence. The fact that the Sons of Silence includes Gruber as one of its members does not mean that Gruber is both a person and an enterprise. Otherwise, "an individual member [of a collective enterprise] could never be prosecuted for violating RICO . . . because he or she would not be considered

-11-

distinct from the enterprise." Id.   Such a result would significantly undermine, if not thwart, the goals of RICO.  Accordingly, we find no error in the RICO portion of the government's superceding indictment.

## C.
### The Improper Compensation Claim

Federal law forbids the giving of "anything of value" in exchange for testimony. See 18 U.S.C. § 201(c)(2).   In this case, the government offered witnesses the possibility of reduced sentences in return for their testimony against Gruber.  Gruber argues that the government violated 18 U.S.C. § 201(c)(2) when it "compensated" witnesses who testified against him.

This court and nearly every other circuit to consider the improper compensation issue has held that a plea arrangement offered in exchange for testimony does not violate 18 U.S.C. § 201(c)(2).[4]  See United States v. Johnson, 169 F.3d 1092, 1098 (8th Cir. 1999), petition for cert. filed, No. 98-4870 (U.S. June 15, 1999). Accordingly, Gruber's improper compensation argument fails.

## D.
### The Quantity and Type of Methamphetamine

_____

[4]Only one circuit has held that a plea agreement with the government in exchange for testimony violates 18 U.S.C. § 201(c)(2). See United States v. Singleton, 144 F.3d 1343, 1345-51 (10th Cir.), vacated, 144 F.3d 1361 (10th Cir. 1998) (en banc). Proceeding en banc, however, the Tenth Circuit reached a result directly contrary to its panel's earlier decision and held that the government's use of plea agreements in exchange for testimony does not transgress section 201(c)(2).  See United States v. Singleton, 165 F.3d 1297, 1299-1302 (10th Cir. 1999) (en banc), cert. denied, No. 98-8758, 1999 WL 185874 (U.S. June 21,1999).

Gruber argues that the district court erred when it determined that he sold d-methamphetamine as opposed to l-methamphetamine. Gruber argues that insufficient evidence exists to conclude that he sold d-methamphetamine and, as a result, he should receive a sentence consistent with the sale of l-methamphetamine. We review a district court's findings regarding the type of methamphetamine for clear error. See United States v. Loveless, 139 F.3d 587, 593 (8th Cir. 1998). In conducting our review, we note that the government bears the burden of proving the type of methamphetamine by a preponderance of the evidence. See id.

The version of the United States Sentencing Guidelines in effect from November 1994, to November 1995, governs the sentencing of Gruber. See U.S. Sentencing Guidelines Manual § 1B1.11(b)(1)(1994) . This version of the Guidelines distinguishes between d-methamphetamine and l-methamphetamine, and imposes more severe penalties for the sale of d-methamphetamine. See United States v. Hall, 171 F.3d 1133, 1153 (8th Cir. 1999). The distinction has since been eliminated. Gruber contends that the government has failed to prove by a preponderance of the evidence that he sold d-methamphetamine throughout the course of the drug conspiracy. Gruber's contention lacks merit.

During Gruber's trial, several witnesses testified regarding the quality of the methamphetamine sold by Gruber. Witnesses who worked with Gruber for several years described the methamphetamine supplied by Gruber as "top of the line dope." (Jeff Gruber Trial Tr. at 810.) A higher quality is consistent with d-methamphetamine. In addition, government agents tested a small portion of the methamphetamine recovered during the investigation of the Sons of Silence drug conspiracy and found that it was d-methamphetamine. The government admits that the amount of methamphetamine tested was minimal in relation to the entire amount of methamphetamine sold during the course of the drug trafficking conspiracy. While such evidence standing alone may be insufficient to show that Gruber primarily distributed d-methamphetamine, the testing evidence combined with the testimony of

-13-

witnesses who actively participated in the drug conspiracy amply supports such a conclusion. Accordingly, we find that the district court committed no error.

Gruber also claims that the district court incorrectly determined his base offense level, see USSG § 2D1.1, when it considered the entire weight of the substance containing the methamphetamine rather than considering only the weight of methamphetamine itself. Gruber argues that the district court erroneously "allowed the [United States] to take whatever weight was more advantageous and would produce [the] greater sentence." (Gruber's Br. at 42.) We review de novo a district court's interpretation of the Sentencing Guidelines. See United States v. Eagle, 133 F .3d 608, 611 (8th Cir.1998).

The Sentencing Guidelines permit two methods for determining a defendant's base offense level in methamphetamine cases. One method is based on the weight of the actual methamphetamine contained within a mixture. The other method is based on the weight of the entire mixture containing a detectable amount of methamphetamine. See USSG § 2D1.1(c) * Notes to Drug Quantity Table; United States v. Beltran, 122 F.3d 1156, 1159 (8th Cir. 1997). Gruber argues that the district court should have considered only the actual weight of the methamphetamine rather than adopt a method that resulted in a higher base offense level. Gruber is mistaken.

The Sentencing Guidelines Drug Quantity Table specifically directs district courts to use the method that results in the greatest offense level for the defendant. See Beltran, 122 F.3d at 1159. The Guidelines provide that "[i]n the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual) or methamphetamine (actual), whichever is greater." USSG § 2D1.1(c) * Notes to Drug Quantity Table (emphasis added); Beltran, 122 F.3d at 1159. The district court correctly followed the Guidelines' mandate. Accordingly, Gruber's drug quantity challenge fails.

## E.
## The Two-Level Firearm Enhancement

Gruber argues that the district court erred when it assessed him with a two-level enhancement for possession of a weapon during the commission of a drug trafficking offense.  See USSG § 2D1.1(b)(1).  Gruber maintains that he did not actively deploy a weapon during the commission of his offense and, therefore, the enhancement should not apply.  Gruber's argument runs contrary to the Guidelines and the facts of this case.

We review a district court's decision to apply a two-level enhancement for possession of a firearm during a drug trafficking offense for clear error.  See United States v. Betz, 82 F.3d 205, 210 (8th Cir. 1996).  Section 2D1.1(b)(1) of the Guidelines mandates a two-level enhancement if the government proves by a preponderance of the evidence that the defendant possessed a weapon during the commission of a drug offense.  See id.  The district court must impose the enhancement unless it finds that it is "clearly improbable that the weapon had a nexus  to criminal activity."  Id.

A substantial nexus between the firearms and the criminal activity exists in this case.  Pursuant to a search warrant, the police raided the home of one of the Sons of Silence drug conspirators and discovered 32 firearms, all of which were owned by Gruber.  In addition, Gruber pistol-whipped one of his associates, VanBrocklin, when VanBrocklin failed to comply with Gruber's orders regarding the payment of money for drugs.  During the pistol-whipping of VanBrocklin, Gruber not only possessed a firearm, he deployed and employed it.  The use of the weapon occurred during the commission of a drug trafficking offense.  Such evidence constitutes a nexus that is sufficient to connect Gruber's firearms to the drug conspiracy.  See United States v. Brown, 148 F.3d 1003, 1009 (8th Cir. 1998) (holding that the pistol-whipping of a drug conspirator is sufficient to support a sentencing enhancement), cert. denied, 119 S. Ct. 1092 (1999).  Accordingly, the district court committed no error when it assessed Gruber with a two-level firearm enhancement.

## III.
## Fairchild's Challenges

## A.
## Double Counting

Fairchild argues that the district court impermissibly double counted his two prior misdemeanor convictions. Before his conviction in the instant case, Fairchild pleaded nolo contendere to two separate firearms charges in Illinois and Kentucky state courts. The two state courts, respectively, sentenced Fairchild to probation and ordered him to pay a fine. The district court assessed Fairchild with two criminal history points for the two misdemeanor offenses. Fairchild claims that the two prior misdemeanor offenses actually were part of the instant drug conspiracy. He argues that the district court counted his misdemeanor firearm offenses as prior convictions for determining his criminal history score, see USSG § 4A1.2(a), and counted the same firearm offenses as proof that he possessed a firearm during the course of the instant drug conspiracy for the purposes of a two-level enhancement of his base offense level. See USSG § 2D1.1(b)(1). Fairchild contends that the district court's action constitutes impermissible double counting.

We first note that even removing the evidence of Fairchild's misdemeanor firearm convictions, substantial other evidence existed to support the two-level firearm enhancement. While investigating the drug conspiracy, federal agents searched Fairchild's home, and discovered several firearms and multiple rounds of ammunition. Such evidence, standing alone, is enough to justify a two-level enhancement under section 2D1.1(b)(1) of the Guidelines. Accordingly, we need not reach Fairchild's double counting argument with respect to the firearm enhancement. An even more compelling reason for affirming the imposition exists. Fairchild agreed in his plea agreement that the weapons possession adjustment was applicable to him. (See Plea Agreement ¶ 6(e) contained in Government's Br., Adden. at 3.)

-16-

With respect to Fairchild's argument that his two prior misdemeanor convictions should not have been scored for criminal history purposes because they were part of the relevant conduct involved in the count of conviction for conspiracy to distribute and possess with intent to distribute methamphetamine, our review of the record reveals that Fairchild made no such argument to the district court at sentencing. The sentencing judge specifically asked Fairchild's counsel whether or not the probation officer had correctly scored the prior misdemeanors for criminal history purposes:

> The Court: Are you claiming that the criminal history points shouldn't be separately scored because they're somehow the other part of the underlying conduct in this case, or is that just part of your departure motion?
>
> Mr. Steinback: That's part of my departure motion issue, Your Honor.
>
> The Court: So you're not disputing that [] probation [has] correctly scored the criminal history?
>
> Mr. Steinback: That is correct. I'm not doing that, Your Honor.
>
> The Court: With that understanding then[,] I will find that the criminal history computation is correctly scored that Mr. Fairchild is at a criminal history [c]ategory [III].

(Timothy Fairchild Sent. Tr. at 9-10.)

Having declined the district court's invitation to make the argument he now seeks to make on appeal, we hold that the appellant has waived the issue below and cannot be permitted to resurrect it now.

We also believe that any alleged error in scoring the prior misdemeanors would have been harmless error. Fairchild was assessed a total of four criminal history points.

If the two prior misdemeanors are not counted, he would be in criminal history category II. An offense level 31, criminal history category III designation yields a sentencing range of 135-168 months. Fairchild was sentenced at the bottom of the range to a 135 month term. If he were in criminal history category II, the sentencing range would have been 121-151 months. His 135 month sentence also falls within that range. In our judgment, the sentencing judge made it quite clear in declining to grant a discretionary downward departure based on an alleged overstating of the seriousness of Fairchild's criminal history by his placement in criminal history category III, that even if Fairchild were in criminal history category II, the sentence would more than likely have been the same - 135 months. (See Timothy Fairchild Sent. Tr. at 22-23.) Accordingly, no prejudice can be shown from the counting of the prior misdemeanor convictions in arriving at criminal history category III, and any alleged error would have been harmless.

## B.
### Fairchild's Downward Departure Motion

Fairchild next challenges the district court's decision not to grant his motion for a downward departure. Fairchild argues that his sentence overstates the seriousness of his prior criminal conduct. It is well-established that a district court's decision not to grant a downward departure motion is virtually unreviewable on appeal as long as the district court was aware of its authority to grant such a departure. See United States v. Eastman, 149 F.3d 802, 805 (8th Cir. 1998). The record in this case reveals that the district court was aware of its departure authority but chose not to exercise it. Hence, we find no basis to review the issue on appeal. Fairchild's sentence stands, and the district court's judgment is affirmed.

## IV.
### Conclusion

-18-

For the reasons stated herein, we affirm the judgment of the district court in each case. The district court recognized that Gruber's convictions on both count 3 (drug conspiracy) and count 38 (continuing criminal enterprise) would constitute a violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution if both were affirmed on appeal, and so the district court at sentencing imposed a provisional life sentence on count three to be effective only if the judgments on count 1 (RICO) and 38 (CCE) were not affirmed. The district court's action was in accord with the procedure we have approved in prior cases to avoid the double jeopardy problem. See United States v. Jelinek, 57 F.3d 655, 660 (8th Cir.), cert. denied, 516 U.S. 890 (1995); United States v. Holt, 969 F.2d 685, 689 (8th Cir. 1992); United States v. Duke, 940 F.2d 1113, 1120 (8th Cir. 1991). Where, as here, the district court has indicated which of the two convictions should be vacated, we remand for dismissal of that count. See Jelinek, 57 F.3d at 660. Accordingly, we vacate Gruber's conviction on count 3 (conspiracy to distribute and possess with intent to distribute methamphetamine) and remand count 3 to the district court for dismissal only as to Gruber. We affirm all other aspects of Gruber's convictions and sentences.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-19-